**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

ECEIVED

JUN 1 1 2014

U.S.D.C. S.D. N.Y.
CASHIERS

JOSEPH EBIN and YERUCHUM JENKINS,
individually and on behalf of all others
similarly situated,

                       Plaintiffs,

      v.

KANGADIS FAMILY MANAGEMENT
LLC, ARISTIDIS KANGADIS a/k/a "MR.
ARIS," ANDROMAHI KANGADIS a/k/a
"MRS. MAHI," and THEMIS KANGADIS,

                    Defendants.

Civil Action 14-cv-1324

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**PAGE**

NATURE OF THE ACTION ................................................................................ 1

THE PARTIES ................................................................................................... 3

JURISDICTION AND VENUE ........................................................................... 5

FACTUAL BACKGROUND ............................................................................... 6

I.   Olive Oil Has Long Been Prized For Its Culinary Value and Health
     Benefits ................................................................................................... 6

II.  Pomace Is Not Olive Oil ......................................................................... 7

III. No Law, Regulation, Or Standard Permits Pomace To Be Labeled As
     Olive Oil .................................................................................................. 7

     A.   The FDA Labeling Requirements ................................................... 8

     B.   New York's Agriculture And Markets Law .................................... 9

     C.   The International Olive Council's Chemical And Labeling
          Requirements ............................................................................... 10

     D.   Gourmet Factory Is Aware Of These Labeling Requirements ............. 11

IV.  Laboratory Testing Confirms That Capatriti-Brand Products Are Not
     "100% Pure Olive Oil" And Instead Contain Pomace ............................ 12

V.   Capatriti's False And Misleading Label ................................................. 14

VI.  Gourmet Factory's Mislabeling Has Caused Harm To Plaintiffs,
     Consumers, And Members Of The Class .................................................. 17

CLASS REPRESENTATION ALLEGATIONS ........................................................................35

    COUNT I ................................................................................................................. 36

    COUNT II ................................................................................................................ 37

    COUNT III............................................................................................................... 38

    COUNT IV............................................................................................................... 39

    COUNT V ................................................................................................................ 40

    COUNT VI............................................................................................................... 41

PRAYER FOR RELIEF ...................................................................................................42

JURY DEMAND............................................................................................................42

Plaintiffs Joseph Ebin and Yeruchum Jenkins, by their attorneys, make the following allegations pursuant to the investigations of counsel and upon information and belief, except as to the allegations specifically pertaining to themselves or their counsel, which are based on personal knowledge:

## NATURE OF THE ACTION

1.     This case is related to *Ebin v. Kangadis Food Inc.*, Civil Action No. 13-cv-2311 (JSR), a certified class action against Kangadis Food Inc., d/b/a The Gourmet Factory ("Gourmet Factory" or "KFI") for its unlawful, misleading, and deceptive misbranding of pomace oil as "Capatriti 100% Pure Olive Oil."

2.     This is a class action against ███████████████████████ ██████ including Kangadis Family Management LLC ("KFM"), Aristidis Kangadis, a/k/a "Mr. Aris," Andromahi Kangadis, a/k/a "Mrs. Mahi," and Themis Kangadis.  This case seeks to impose liability on KFM and on these individuals personally for their direct involvement in the unlawful scheme to pass off pomace oil as "Capatriti 100% Pure Olive Oil," and also on a veil piercing theory as these individual defendants have looted KFI of its assets to attempt to frustrate the certified Class's ability to collect on the judgment they will eventually obtain.  Gourmet Factory markets oils for human consumption under the "Capatriti" brand as "100% Pure Olive Oil."  But Gourmet Factory's "100% Pure Olive Oil" is nothing of the sort; instead of "olive oil," Gourmet Factory's product consists of an industrially produced, chemically derived fat known as "olive-pomace oil" or "olive-residue oil" (hereafter "Pomace").

3.     Pomace is a byproduct extracted from leftover olive skins and pits using a combination of chemical solvents and high temperatures.  Unsurprisingly, because Pomace can be obtained only through heating and solvent treatments, it does not appear in pure olive oil.  And, although it comes from olives, it is *not* olive oil.

4.     Calling a product "olive oil" when it contains Pomace or any other non-olive oil is barred by an array of olive-oil-making conventions, standard industry practices, international

regulations, and federal and state laws.  According to several authorities, a product containing more than a negligible amount of Pomace must contain a prominent disclosure of that fact on the label.  Gourmet Factory does not disclose its use of Pomace, and instead misleads purchasers as to the very nature of its product by, among other things, disguising Pomace as "100% Pure Olive Oil."

5.       The label and packaging of Capatriti "100% Pure Olive Oil" represents that the product is "Olive Oil" or "100% Pure" olive oil in at least 9 places:  (i) the product's name (*i.e.,* Capatriti "100% Pure Olive Oil") is prominently placed on the top of the container and on all 4 sides, (ii) the representation "100% Pure" appears in large, vertical letters on the front and back of the container, (iii) the text, "Product contains high quality olive oil" appears below the Nutrition Facts, and (iv) one side of the container represents that "thanks to the Gourmet Factory, Americans can also enjoy this renowned olive oil."

6.       Gourmet Factory's misbranding is intentional.  Olive oil and Pomace arise out of distinct production processes, and any reasonable quality-control check would detect the presence of Pomace.  A packer or distributor of olive oils therefore does not unwittingly mislabel Pomace as olive oil.

7.       The mislabeling of Capatriti "100% Pure Olive Oil" renders the product completely worthless.  By mislabeling its products, Gourmet Factory dupes consumers into purchasing something that is *not* olive oil.  Nevertheless, Capatriti "100% Pure Olive Oil" is labeled and sold as premium olive oil, and it commands a substantial price premium over other Pomace products.  For example, Capatriti "100% Pure Olive Oil" commands a 67% price premium, per fluid ounce, over a competing Pomace brand:

| Brand | Quantity | Price | Unit Price |
|---|---|---|---|
| Capatriti "100% Pure Olive Oil" | 101 fl. oz. | $16.49 | $0.163 per fl. oz. |
| Marconi Olive Pomace Oil | 128 fl. oz. | $12.49 | $0.098 per fl. oz. |

Plaintiffs and class members have thus been hit with a costly double-whammy:  a premium purchase price for a worthless product.

8.     Through this lawsuit, Plaintiffs seek to recover, for themselves and all other similarly situated purchasers of Capatriti "100% Pure Olive Oil" in the United States, a full refund of the purchase price.

## THE PARTIES

9.     Plaintiff Joseph Ebin is a citizen of New York who resides in Bronx County, New York.  In late 2012, Plaintiff Ebin purchased a 101 fl. oz. container of Capatriti "100% Pure Olive Oil" at a local grocery store in Bronx County, New York.  He paid approximately $16.49. The container he purchased prominently displayed the product name (*i.e.,* Capatriti "100% Pure Olive Oil") on the top of the container and on all 4 sides.  The container also represented that it contained "100% Pure" olive oil in large, vertical letters, which were displayed on the front and back labels.  He saw these representations prior to and at the time of purchase, and understood them as representations and warranties that the product was, in fact, 100% pure olive oil.  He relied on these representations and warranties in deciding to purchase Capatriti "100% Pure Olive Oil," and these representations and warranties were part of the basis of the bargain, in that he would not have purchased Capatriti "100% Pure Olive Oil" if he had known that the product was not, in fact, 100% pure olive oil.  He also understood that in making the sale, the retailer was acting with the knowledge and approval of Gourmet Factory and/or as the agent of Gourmet Factory.  He also understood that the purchase involved a direct transaction between himself and

Gourmet Factory, because his purchase came with Gourmet Factory's representations and warranties that the product was, in fact, 100% pure olive oil.

10.     Plaintiff Yeruchum Jenkins is a citizen of New Jersey who resides in Passaic County, New Jersey.  In early 2013, Plaintiff Jenkins purchased a container of Capatriti "100% Pure Olive Oil" at a local grocery store in New Jersey.  The container he purchased prominently displayed the product name (*i.e.,* Capatriti "100% Pure Olive Oil") on the top of the container and on all 4 sides.  The container also represented that it contained "100% Pure" olive oil in large, vertical letters, which were displayed on the front and back labels.  He saw these representations prior to and at the time of purchase, and understood them as representations and warranties that the product was, in fact, 100% pure olive oil.  He relied on these representations and warranties in deciding to purchase Capatriti "100% Pure Olive Oil," and these representations and warranties were part of the basis of the bargain, in that he would not have purchased Capatriti "100% Pure Olive Oil" if he had known that the product was not, in fact, 100% pure olive oil.  He also understood that in making the sale, the retailer was acting with the knowledge and approval of Gourmet Factory and/or as the agent of Gourmet Factory.  He also understood that the purchase involved a direct transaction between himself and Gourmet Factory, because his purchase came with Gourmet Factory's representations and warranties that the product was, in fact, 100% pure olive oil.

11.     The defendant in the related case, Civil Action No. 13-cv-2311 (JSR),  Kangadis Food Inc., d/b/a The Gourmet Factory, is a closely held business existing under the laws of the State of New York, with its principal place of business at 55 Corporate Drive, Hauppauge, New York.  Gourmet Factory holds itself out as an importer of olive oils, olives, and other foodstuffs. Among other products, Gourmet Factory imports and distributes olive oils under the Capatriti and Sevilla Mia brands.  Gourmet Factory markets and sells these oils widely throughout New York, New Jersey, and other states.

12.     Defendant Kangadis Family Management LLC ("KFM") is a limited liability company existing under the laws of the State of New York, with its principal place of business at

76-01 77th Avenue, Glendale, New York. ████████████████████████

████████████████████████████████████████████████████████

█████████████████████

  13. Defendant Aristidis Kangadis, a/k/a "Mr. Aris," is a citizen of New York, residing

in Whitestone, New York. █████████████████████████

████████████████████████████████████

  14. Defendant Andromahi Kangadis, a/k/a "Mrs. Mahi," is a citizen of New York,

residing in Whitestone, New York. ███████████████████████████

███████

  15.  Defendant Themis Kangadis is a citizen of New York, residing in Sands Point,

New York. ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

## JURISDICTION AND VENUE

  16. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal

question).  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C.

§ 1367.

  17. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(d)  because there are more than 100 class members and the aggregate amount in

controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class

member is a citizen of a state different from Defendants.

  18. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action

because a substantial part of the events, omissions, and acts giving rise to the claims herein

occurred in this District.  Plaintiff Ebin is a citizen of New York, resides in this District, and

purchased Capatriti "100% Pure Olive Oil" from Defendants in this District.  Moreover,

Defendants distributed, advertised, and sold Capatriti "100% Pure Olive Oil," which is the subject of the present Complaint, in this District.

## FACTUAL BACKGROUND

### I.      Olive Oil Has Long Been Prized For Its Culinary Value and Health Benefits

19.      Olive oil comes from the fruit of the olive tree (*Olea europaea* L.), a species native to the Mediterranean basin.  Olive tree cultivation was first documented as far back as 4,000 B.C., in parts of what is now Syria and Iran, with sources as old as Egyptian hieroglyphics and the Bible discussing olive oil production.  By the time of the Roman Empire, olive oil had become a staple of Mediterranean trade.  Although olive production has, in recent years, spread to Australia, South Africa, Chile, Argentina, and the United States, nearly 95 percent of the world's olive oil continues to be produced in the Mediterranean basin.

20.      Since ancient times, people have recognized olive oil's substantial and beneficial effects on human health.  Olive oil contains monounsaturated fatty acids, which leading healthcare professionals consider a "healthy dietary fat" that can lower bad LDL cholesterol and raise good HDL cholesterol.  For this reason, the United States Food and Drug Administration ("FDA") approved a qualified heart health claim for olive oil in 2004 that was based on more than 70 clinical intervention studies conducted in a number of countries.  A diet with olive oil as a main source of fat has been linked to health benefits favorably affecting susceptibility to cardiovascular disease, diabetes, stroke, cancer, and more.  Evidence shows that olive oil helps the body absorb beneficial nutrients from vegetables and other healthy ingredients in meals. Olive oil also is an excellent source of vitamins E and K.

21.      Consumers use olive oil in many ways.  Many add olive oil to salad dressings, marinades, baked goods, sauces, and pastas.  In addition, olive oil's high smoke point makes it one of the most stable fats for cooking and frying, and, unlike some other oils, many of its healthful qualities persist after heating.

22.      Given the many health benefits and culinary uses of olive oils, it is no surprise that the market for olive oil has grown enormously over the last several decades.  Since 1990,

total consumption of olive oil in the United States has more than doubled, reaching 70 million gallons in 2009.  With broader consumer recognition of olive oil's considerable health benefits, consumption in the United States seems poised to continue to increase for years to come.

## II.    Pomace Is Not Olive Oil

23.    "Olive oil," as it is scientifically, commercially, and legally defined, is "the oil consisting of a blend of refined olive oil and virgin olive oils fit for consumption as they are." The components of this blend consist of:  virgin olive oil, defined as "the oils obtained from the fruit of the olive tree solely by mechanical or other physical means under conditions, particularly thermal conditions, that do not lead to alterations in the oil, and which have not undergone any treatment other than washing, decantation, centrifugation and filtration;" and refined olive oil, defined as "the olive oil obtained from virgin olive oils by refining methods which do not lead to alterations in the initial glyceridic structure."[1]

24.    In contrast, Pomace is a highly processed industrial fat derived by applying heat and chemical solvents to the olive skins and pits left over from the production of olive oil.  *See* 47 Fed. Reg. 42123 (Sept. 24, 1982) ("[S]olvent extraction is a standard procedure for removing oil from substances having low oil contents, such as safflower and cotton seeds.  Olives, however, have a high oil content and the oil is easily removed by a mechanical or physical process, such as pressing.  Solvent extraction of oil from olives is used to remove the residual oil from the pomace and pits remaining from pressing operations.").  The cost of producing oil in this manner is a fraction of the cost of producing olive oil.

## III.   No Law, Regulation, Or Standard Permits Pomace To Be Labeled As Olive Oil

25.    Although Pomace can sometimes be refined or mixed with olive oil to make it fit for human consumption, no recognized regulatory body or organization in the world permits

---

[1]  International Olive Council, Trade Standard Applying to Olive Oils and Olive-Pomace Oils, COI/T.15/NCNo.3/Rev 6 at 3.3.3 (Nov. 2011) [hereinafter "IOC Trade Standards"].

Pomace or products containing Pomace to be passed off as "olive oil."  Rather, these oils must be labeled as some form of "olive-pomace" or "olive-residue oil."

26.     According to the FDA, "[s]olvent-extracted olive oil is lower in quality than pressed olive oils due to the higher free fatty acid content caused by breakdown to triglycerides by enzymes liberated from the olive material during the pressing operations.  As the free fatty acid content increases, the flavor and keeping quality of the oil deteriorate and the oil must undergo several refining processes to make it suitable for human consumption.  For these reasons, the agency believes that it is reasonable to identify a solvent extracted olive oil as a 'residue oil.'" 47 Fed. Reg. 42123 (Sept. 24, 1982).

27.     Despite vigilant policing by responsible industry members, the cost disparities between olive oil and other vegetable oils nevertheless create a financial incentive for fraudsters to adulterate olive oils with cheaper oils (such as Pomace or seed oils) and disguise it as olive oil.

28.     Various state, federal, and international bodies have promulgated standards to guard against deceptive mislabeling, including standards to distinguish olive oil from Pomace. Relevant here are three regulatory bodies:  the FDA, the New York State legislature, and the International Olive Council.  They have adopted standards that reflect the longstanding industry practices that underlie relevant consumer expectations.

A.     **The FDA Labeling Requirements**

29.     The FDA has promulgated the following definitions for classifying olive-derived oils:

> The name "virgin olive oil" may be used only for the oil resulting from the first pressing of the olives and which is suitable for human consumption without further processing.  The name "refined olive oil" refers to the oil obtained from subsequent pressings and which is made suitable for human consumption by refining processes which neutralize the acidity and remove particulate matter.  Oil extracted from olive pomace and pits by chemical means and refined to make it edible must be labeled either "refined olive-residue oil" or "refined extracted olive residue oil."  Blends of virgin olive oil and refined olive oil may be labeled as "olive oil," but blends of olive oil with other edible fats or oils must be labeled in accordance with 21 C.F.R. § 102.37.

47 Fed. Reg. 42,123 (Sept. 24, 1982).

30.     C.F.R. § 102.37(b) in turn provides that:  "When the label bears any representation, other than in the ingredient listing, of the presence of olive oil in the mixture, the descriptive name shall be followed by a statement of the percentage of olive oil contained in the product."

**B.     New York's Agriculture And Markets Law**

31.     Similarly, under NewYork law, "olive oil" is defined as the oil "obtained solely from the fruit of the olive tree (*olea europaea*), to the exclusion of oils obtained using solvents or reesterification processes and of any mixture with oils of other kinds."  N.Y. Agric. & Mkts. Law § 204-a(l)(a).  "[R]efined olive oil" is the "olive oil obtained from virgin olive oils by refining methods which do not lead to alterations in the initial glyceridic structure.  It has free acidity, expressed as oleic acid, of not more than 0.3 grams per hundred grams."  *Id.* § 204-a(l)(c). "Olive-pomace oil" is "oil obtained by treating olive pomace with solvents or other physical treatments."  *Id.* § 204-a(l)(b).

32.     New York's legislature has made it "unlawful for any person to manufacture, pack, possess, sell, offer for sale, and/or expose for sale any compound or blended oil of any kind which purports to be an olive oil mixture unless the container thereof be permanently and conspicuously labeled 'compound oil' or 'blended oil' with a statement of the different ingredients thereof and the specific percentage of olive oil, the total percentage of other vegetable oils and the specific percentage of each other ingredient comprising more than one half of one per centum of the mixture."  *Id.* §204-a.  In particular, no olive oil containing "more than one-half of one per centum" of Pomace may legally be sold in New York unless it is "conspicuously labeled 'compound oil' or 'blended oil,'" and unless its label discloses the presence and amount of Pomace therein.  *Id.*

33.     "Failure to meet the[se] standards . . . shall render olive oil sold in intrastate commerce in the state misbranded."  *Id.* § 204-a(3)(b).

C.      **The International Olive Council's Chemical And Labeling Requirements**

34.      The International Olive Council ("IOC") promulgates world-recognized standards used to determine the quality and purity of olive oils.  Although the United States is not an IOC member, the IOC's standards undergird the FDA and New York olive oil regulations.

35.      The IOC was formed in 1959, in Madrid, Spain, under the auspices of the United Nations, with the purpose of creating universal industry trade standards.  Today, IOC member countries account for 98% of the world's olive oil production.

36.      The IOC actively monitors and seeks to prevent olive oil fraud throughout its member countries.  In addition, the IOC has certified a small number of laboratories around the world that meet rigorous guidelines for performing chemical and sensory tests of olive oils.[2]

37.      The IOC has developed a number of tests that enable one to differentiate olive oil from Pomace.  For example:

a.      Erythrodiol and uvaol are two compounds commonly found in Pomace and grapeseed oil.  If these compounds constitute more than 4.5 percent of an oil's total sterol content, then the oil is not olive oil.  It is either Pomace or grapeseed oil.  *See* IOC Trade Standards at 3.3.3.

b.      Olive skins contain almost all of an olive's wax.  Thus, authentic olive oil, which is pressed from olive flesh, contains only miniscule amounts of wax; Pomace, which is made, in part, from olive skins, contains significant amounts of wax.  As a result, oils that have a wax content in excess of 350 mg/kg are Pomace, not olive oil.  *See* IOC Trade Standards at 3.4.

c.      A ratio greater than 0.3 between triacylglycerols with equivalent carbon number 42 (ECN 42) and the theoretical ECN 42 (a number calculated

---

[2]  International Olive Council, List Of Chemical Testing Laboratories Recognized By The International Olive Council For The Period From 1.12.2011 to 30.11.2012, T.21/Doc. n° 13/Rev. 14 (Nov. 2011).

using standard formulations based on an oil's fatty acid composition) demonstrates the presence of Pomace and/or seed oils. *See* IOC Trade Standards at 3.5.

38.    Under IOC standards, just like under FDA and New York regulations, no one can label Pomace as olive oil. Nor is it permissible to blend Pomace with olive oil and label the mixture as "olive oil." IOC Trade Standards at 2.2.3 ("In no case shall this blend be called 'olive oil.'").

### D.    Gourmet Factory Is Aware Of These Labeling Requirements

39.    Gourmet Factory is aware of the difference between pure olive oil and Pomace. In 2008, the Connecticut legislature adopted criteria used by the IOC to measure olive oil quality and punish the sale of olive oils that – to cut production costs – are watered down with hazelnut, soy, or peanut oils. *See* Conn. Agencies Regs. § 2la-100-8 (2008) (adopting IOC standards of identify for olive oils and pomace oils). In 2009, however, Dennis Kangadis, Gourmet Factory's vice president, tried and failed to enjoin the Connecticut Department of Consumer Protection from enforcing these criteria and banning misbranded olive oil that did not comply with those standards.[3] Gourmet Factory's counsel at the time stated that, "The Gourmet Factory's reputation and business relationships have already been harmed by [the] adoption of the state Olive Oil Standards."

40.    As a result of Connecticut's adoption of IOC standards and Gourmet Factory's lawsuit to forestall their enactment, Gourmet Factory was on notice about the relevant standards that distinguish olive oil from Pomace.

---

[3]  *See Kangadis Food, Inc. v. Farrell*, No. CV-084041370-S, 2009 WL 1140487 (Conn. Super. Ct. Mar. 26, 2009).

**IV.    Laboratory Testing Confirms That Capatriti-Brand Products Are Not "100% Pure Olive Oil" And Instead Contain Pomace**

41.     In August 2012, the North American Olive Oil Association ("NAOOA"), an international trade association of marketers, packagers, and importers of olive oil, retained an independent third party that specializes in imported food safety to purchase tins of Capatriti "100% Pure Olive Oil" from store shelves in New York and New Jersey.  The tins included lots 52312, 61812, and 71612.

42.     The independent third party then carefully packed and shipped nine tins of the Capatriti "100% Pure Olive Oil" – three from each of the three lots – to one of the foremost experts in the world on olive oil testing, Professor Lanfranco Conte.

43.     Professor Conte previously served for ten years as the Chief Chemist for the Food Fraud Detection Unit at Italy's Ministry of Agriculture.  He currently is a Full Professor of Food Chemistry at the University of Udine, Italy, where he teaches Food Chemistry, Chemical Analysis of Foods, and Food Quality Certification, and is the Chair of the Educational Board of Food Science and Technology Course, Chair of the Course in Food Science and Technology, and Head of the Department of Food Science.  He is an executive member of multiple scientific and regulatory bodies, including:  the Olive Oil Chemist Experts of the European Union, the International Olive Council, the European Food Safety Authority, and the Olive Oil Division at the European Federation of Scientific Society for the Study of Lipids (co-chair of the Managing Board).  He has authored approximately 150 scientific papers in peer-reviewed journals and four book chapters, serves as a peer-reviewer for several scientific journals, and serves as the coeditor of the Italian Journal of Food Sciences.

44.     Professor Conte received the nine tins of Capatriti "100% Pure Olive Oil" on September 11, 2012.  He then stored them in a dry, temperature-controlled room, which he uses to store numerous olive oil samples for research purposes.  Professor Conte then prepared samples for testing by following a generally accepted methodology that is designed to ensure that the laboratory is blind to the identity of the brand of oil being tested.  He chose one tin from each

12

lot at random, stirred the oil within the tin to account for any separation or settling, and then carefully filled two 500- milliliter, opaque bottles with oil from each tin, which he labeled with the corresponding lot numbers.  Professor Conte then submitted the samples for a full suite of testing at an IOC certified laboratory in Madrid, Spain.

45.     Upon receiving the results in late October 2012, Professor Conte definitively concluded that the samples of Capatriti "100% Pure Olive Oil," contrary to their labels' assertions, were not olive oil.  Based on a number of separate objective chemical criteria, these samples of  "100% Pure Olive Oil" were, at best, some type of Pomace, and, at worst, may also contain seed oils.  As such, none of the samples was – or could properly be labeled, represented, or commonly understood to be – olive oil.

46.     The results did not leave room for doubt.  On several criteria, the samples exceeded *by five to six times* the established thresholds for distinguishing olive oil from Pomace:

|  | **Maximum for Olive Oil** | **Capatriti Lot No. 52912** | **Capatriti Lot No. 61812** | **Capatriti Lot No. 71612** |
|---|---|---|---|---|
| **Wax Content** | ≤ 350 mg/kg | 1,862 mg/kg | 2,238 mg/kg | 2,181 mg/kg |
| **Erythrodiol & Uvaol Content** | ≤ 4.5% | 26.4% | 20.7% | 22.3% |
| **ECN 42 Triacylglycerol** | ≤ |0.3| | 1.1 | 0.6 | 0.4 |

47.     These results cannot be blamed on merely poor quality olive oil or the handling and storage of the particular tins purchased for testing.  These results simply could not have occurred if these lots of ostensibly "100% Pure Olive Oil" contained only oils extracted from olives exclusively through mechanical methods.  In other words, markers of Pomace and seed oil at these levels do not appear in olive oil by happenstance.  Importantly, no matter which standard is used to determine olive oil quality, or distinguish between olive oil and Pomace or seed oils, the fact remains that the chemical profile of the Capatriti "100% Pure Olive Oil" cannot be

reconciled with the chemical profile of olive oil – a defect that Gourmet Factory does not disclose on its labeling.

48.     Furthermore, because of the extreme differences in production processes between Pomace and olive oil, the presence of pomace oil in even one tin means that all of the tins with the same lot code contain Pomace.

**V.     Capatriti's False And Misleading Label**

49.     The front and back label of Capatriti "100% Pure Olive Oil" prominently displays the product's name.  Additionally, the front and back label represents that the product contains "100% Pure" olive oil.  This text appears in large, vertical letters and is placed adjacent to an image of an olive branch.



50.     One side of the container represents, below the Nutrition Facts, "Product contains high quality olive oil from Italy, Greece, Spain and Tunisia."  Additionally, the product's name is prominently displayed.



51.    The other side of the container represents, "For Centuries, Italians Have Treasured Olive Oil As A Symbol Of Purity, Fortitude And Peace.  Italians have clamored in line to purchase the [sic] Capatriti Olive Oil.  Now, for the first time, thanks to the Gourmet Factory, Americans can also enjoy this renowned olive oil."  Additionally, the product's name is prominently displayed.



52.    The top of the container also prominently display's the product's name.



53.    Each of these representations are false and misleading.  As discussed above, Capatriti "100% Pure Olive Oil" is neither olive oil nor 100% pure olive oil.

16

**VI.    Gourmet Factory's Mislabeling Has Caused Harm To Plaintiffs, Consumers, And Members Of The Class**

54.    The results of the NAOOA's independent testing demonstrate that Gourmet Factory, under the Capatriti brand, mislabels its "100% Pure Olive Oil."  Instead of 100% pure olive oil, the oil either is completely Pomace, or is adulterated with Pomace and/or other seed oils.  In light of the price premium at which Gourmet Factory sells Capatriti-brand olive oil when compared to other brands of Pomace oil, and given the unlikelihood that such exceptional test results could occur by chance in all three lots that were randomly selected for testing, Plaintiffs believe that Gourmet Factory has used Pomace or adulterated oils in far more than the above-described three lots, and has been willfully and deceptively passing off Pomace and/or seed oil as "100% Pure Olive Oil."

55.    Gourmet Factory's actions have caused harm and are likely to continue to cause harm to the public and members of the class.  A reasonable consumer purchasing a product labeled "100% Pure Olive Oil" would expect it to adhere not just to federal, state, and international guidelines, but that it meets the basic, millennia-old understanding that "olive oil" means the unadulterated oil that comes from pressing olives – *not* from a chemical process that uses heat and solvents to extract oil from the residue of an olive's pits and skin.  Gourmet Factory's mislabeling thus deceives consumers.  The strong consumer preference for olive oil over Pomace is evidenced by the almost complete lack of consumer demand for Pomace for human consumption in the United States, despite the significantly cheaper price of Pomace compared to olive oil.

56.    Gourmet Factory has introduced its adulterated and misbranded edible oil into interstate commerce, offering it for sale in several states.  For instance, Plaintiffs purchased Capatriti "100% Pure Olive Oil" in New York and New Jersey.  These oils bore the same deceptive representation that their contents were "100% Pure Olive Oil" when, in fact, they should have been labeled as Pomace or labeled as a blend containing seed oils.

57.     On information and belief, Gourmet Factory has acted willfully in misbranding its products.  Passing off Pomace or oil made from non-olive sources (*e.g.,* seeds) as "100% Pure Olive Oil" is not something that can be done by accident or through mere negligence. Accordingly, Plaintiffs allege that Gourmet Factory knows that its oils are not "100% Pure Olive Oil," and Gourmet Factory intentionally deceives consumers into purchasing its adulterated edible oil products.

███     ███████████████████████████████████████████
███████████████████████████

58.     On September 26, 2013, Defendants' counsel George Krueger objected to Plaintiffs' request to take the deposition of Aristidis Kangadis on the ground that he "is a 73 year old gentleman who is not identified in the Defendants' Disclosures or other discovery responses as having knowledge of the relevant facts.  He is … uninvolved with the business.  He has no official role in the company."  9/26/13 Letter from George Krueger to Joseph I. Marchese at 2. On October 1, 2013, Mr. Krueger repeated those statements to the Court during a telephonic conference and secured a court order restricting Plaintiffs' from conducting an in-person deposition of Aristidis Kangadis.

59.     In fact, Aristidis Kangadis ████████████████████████
████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████
███████████████████████████
███    ██████████████████████████████
████████████████████████████████████████























**IX.    Veil Piercing / Alter Ego Allegations**

██   ████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████

██   ███████████████████████████████████

████████████████████████████████████████

74.     According to NY DOS corporate records, KFI and KFM share the same principal

address: 76-01 77th Avenue, Glendale, New York. ████████████████████████

████████████████████████████████████████████

███████████

██   ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████

██   ███████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

██   ████████████████████████████

████████████████████████████████

██   ██████████████████████████████

███████████

██   ███████████████████████

██   ████████████████████████

████████████████████████████████████████████

██████████████████

██   ██████████████████████









**CLASS REPRESENTATION ALLEGATIONS**

79.     Plaintiffs seek to represent a class defined as all persons in the United States who purchased Capatriti 100% Pure Olive Oil (the "Class").  Excluded from the Class are persons who made such purchase for purpose of resale.

80.     Plaintiff Ebin also seeks to represent a subclass of all Class members who purchased Capatriti "100% Pure Olive Oil" in New York (the "New York Subclass").

81.     Plaintiff Jenkins also seeks to represent a subclass of all Class members who purchased Capatriti "100% Pure Olive Oil" in New Jersey (the "New Jersey Subclass").

82.     Members of the Class and Subclasses are so numerous that their individual joinder herein is impracticable.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third party retailers and vendors.

83.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:  whether Capatriti "100% Pure Olive Oil" is, in fact, 100% pure olive oil; whether Gourmet Factory negligently mislabeled Capatriti "100% Pure Olive Oil;" and whether Gourmet Factory intentionally deceived Plaintiffs and Class members by mislabeling Capatriti "100% Pure Olive Oil."

84.     The claims of the named Plaintiffs are typical of the claims of the Class and Subclasses in that the named Plaintiffs purchased one or more containers of Capatriti "100% Pure Olive Oil."

85.     Plaintiffs are adequate representatives of the Class and Subclasses because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

86.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class and Subclass members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I

### (Breach Of Express Warranty)

87.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

88.     Plaintiffs assert this claim against Aristidis and Themis Kangadis individually on a theory of direct liability for their personal actions.

89.     Plaintiffs assert this claim against KFM, Aristidis, Andromahi and Themis Kangadis through a veil-piercing theory.

90.     Plaintiff Jenkins brings this claim individually and on behalf of the members of the New Jersey Subclass against Defendants.

36

91.     Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, expressly warranted that Capatriti "100% Pure Olive Oil" was, in fact, 100% pure olive oil.

92.     In fact, Capatriti "100% Pure Olive Oil" is an adulterated product that consists of Pomace, not 100% pure olive oil.

93.     As a direct and proximate cause of Defendants' breach of express warranty, Plaintiff Jenkins and members of the New Jersey Subclass have been injured and harmed because (a) they would not have purchased Capatriti "100% Pure Olive Oil" if they had known it was not, in fact, 100% pure olive oil, and (b) they overpaid for Capatriti "100% Pure Olive Oil" because it is sold at a price premium when compared to Pomace.

## COUNT II

### (Breach Of Implied Warranty Of Merchantability)

94.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

95.     Plaintiff Jenkins brings this claim individually and on behalf of the members of the New Jersey Subclass against Defendants.

96.     Plaintiffs assert this claim against Aristidis and Themis Kangadis individually on a theory of direct liability for their personal actions.

97.     Plaintiffs assert this claim against KFM, Aristidis, Andromahi and Themis Kangadis through a veil-piercing theory.

98.     Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, impliedly warranted that Capatriti "100% Pure Olive Oil" was, in fact, 100% pure olive oil.

99.     Defendants breached the warranty implied in the contract for the sale of Capatriti "100% Pure Olive Oil" because it could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were unfit for their intended and ordinary purpose because Capatriti "100% Pure Olive Oil" is an

adulterated product that consists of Pomace, not 100% pure olive oil.  As a result, Plaintiff Jenkins and members of the New Jersey Subclass did not receive the goods as impliedly warranted by Defendants to be merchantable.

100.    Plaintiffs and Class members purchased Capatriti "100% Pure Olive Oil" in reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose.

101.    Capatriti "100% Pure Olive Oil" was not altered by Plaintiff Jenkins or members of the New Jersey Subclass.

102.    Capatriti "100% Pure Olive Oil" was defective when it left the exclusive control of Defendants.

103.    Defendants knew that Capatriti "100% Pure Olive Oil" would be purchased and used without additional testing by Plaintiff Jenkins and members of the New Jersey Subclass.

104.    Capatriti "100% Pure Olive Oil" was defectively designed and unfit for its intended purpose, and Plaintiffs and Class members did not receive the goods as warranted.

105.    As a direct and proximate cause of Defendants' breach of warranty, Plaintiff Jenkins and members of the New Jersey Subclass have been injured and harmed because (a) they would not have purchased Capatriti "100% Pure Olive Oil" if they had known it was not, in fact, 100% pure olive oil, and (b) they overpaid for Capatriti "100% Pure Olive Oil" because it is sold at a price premium when compared to Pomace.

## COUNT III

### (Deceptive Acts Or Practices, New York Gen. Bus. Law § 349)

106.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

107.    Plaintiff Ebin brings this claim individually and on behalf of the members of the proposed New York Subclass against Defendants.

108.    Plaintiffs assert this claim against Aristidis and Themis Kangadis individually on a theory of direct liability for their personal actions.

38

109.    Plaintiffs assert this claim against KFM, Aristidis, Andromahi and Themis Kangadis through a veil-piercing theory.

110.    By the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices by misrepresenting that Capatriti "100% Pure Olive Oil" was, in fact, 100% pure olive oil.

111.    The foregoing deceptive acts and practices were directed at consumers.

112.    The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics of Capatriti "100% Pure Olive Oil" to induce consumers to purchase same.

113.    Plaintiff Ebin and members of the New York Subclass were injured because (a) they would not have purchased Capatriti "100% Pure Olive Oil" if they had known it was not, in fact, 100% pure olive oil, and (b) they overpaid for Capatriti "100% Pure Olive Oil" because it is sold at a price premium when compared to Pomace.

114.    On behalf of himself and other members of the New York Subclass, Plaintiff Ebin seeks to enjoin the unlawful acts and practices described herein, to recover his actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT IV

### (Violation Of The New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.*)

115.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

116.    Plaintiff Jenkins brings this claim individually and on behalf of the members of the proposed New Jersey Subclass against Defendants.

117.    Plaintiffs assert this claim against Aristidis and Themis Kangadis individually on a theory of direct liability for their personal actions.

118.    Plaintiffs assert this claim against KFM, Aristidis, Andromahi and Themis Kangadis through a veil-piercing theory.

119.    Defendants made misrepresentations about Capatriti "100% Pure Olive Oil" to consumers, including but not limited to, the representation that the product is, in fact, 100% pure olive oil.

120.    Defendants engaged in an unconscionable commercial conduct because Capatriti "100% Pure Olive Oil" is an adulterated product that consists of Pomace, not 100% pure olive oil.

121.    Plaintiff Jenkins and members of the New Jersey Subclass suffered an ascertainable loss caused by Defendants' misrepresentations because (a) they would not have purchased Capatriti "100% Pure Olive Oil" if they had known it was not, in fact, 100% pure olive oil, and (b) they overpaid for Capatriti "100% Pure Olive Oil" because it is sold at a price premium when compared to Pomace.

122.    Defendants' dissemination of these misrepresentations in order to sell more of its product were actuated by actual malice and/or accompanied by a wanton and willful disregard of harm to Plaintiff Jenkins and members of the New Jersey Subclass.

## COUNT V

### (Negligent Misrepresentation)

123.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

124.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class, New York Subclass, and New Jersey Subclass against Defendants.

125.    Plaintiffs assert this claim against Aristidis and Themis Kangadis individually on a theory of direct liability for their personal actions.

126.    Plaintiffs assert this claim against KFM, Aristidis, Andromahi and Themis Kangadis through a veil-piercing theory.

127.    As discussed above, Defendants represented that Capatriti "100% Pure Olive Oil" is, in fact, 100% pure olive oil but failed to disclose that it is actually an adulterated product that consists of Pomace, not 100% pure olive oil.  Defendants had a duty to disclose this information.

40

128.     At the time Defendants made these representations, Defendants knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

129.     At an absolute minimum, Defendants negligently misrepresented and/or negligently omitted material facts about Capatriti "100% Pure Olive Oil."

130.     The negligent misrepresentations and omissions made by Defendants, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class members to purchase Capatriti "100% Pure Olive Oil."

131.     Plaintiffs and Class members would not have purchased Capatriti "100% Pure Olive Oil" if the true facts had been known.

132.     The negligent actions of Defendants caused damage to Plaintiffs and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT VI

### (Fraud)

133.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

134.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class, New York Subclass, and New Jersey Subclass against Defendants.

135.     Plaintiffs assert this claim against Aristidis and Themis Kangadis individually on a theory of direct liability for their personal actions.

136.     Plaintiffs assert this claim against KFM, Aristidis, Andromahi and Themis Kangadis through a veil-piercing theory.

137.     As discussed above, Defendants provided Plaintiffs and Class members with false or misleading material information and failed to disclose material facts about Capatriti "100% Pure Olive Oil," including but not limited to the fact that it is an adulterated product that consists of Pomace, not 100% pure olive oil.  These misrepresentations and omissions were made with knowledge of their falsehood.

41

138.    The misrepresentations and omissions made by Defendants, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class members to purchase Capatriti "100% Pure Olive Oil."

139.    The fraudulent actions of Defendants caused damage to Plaintiffs and Class members, who are entitled to damages and other legal and equitable relief as a result.

## PRAYER FOR RELIEF

140.    WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

A.    For an order certifying the nationwide Class and the Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Subclasses and Plaintiffs' attorneys as Class Counsel to represent members of the Class and Subclasses;

B.    For an order declaring the Defendants' conduct violates the statutes referenced herein;

C.    For an order finding in favor of Plaintiffs, the nationwide Class, and the Subclasses on all counts asserted herein;

D.    For an order piercing the corporate veils of KFI and KFM and attaching personal liability to Aristidis, Andromahi and Themis Kangadis jointly and severally;

E.    For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

F.    For prejudgment interest on all amounts awarded;

G.    For an order of restitution and all other forms of equitable monetary relief;

H.    For injunctive relief as pleaded or as the Court may deem proper; and

J.    For an order awarding Plaintiffs, the Class, and the Subclasses their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated:  June 11, 2014                          Respectfully submitted,

                                               BURSOR & FISHER, P.A.


                                               By:  _____
                                                          Scott A. Bursor

                                               Scott A. Bursor (SB1141)
                                               Joseph I. Marchese (JM1976)
                                               Neal J. Deckant (ND1984)
                                               Yitzchak Kopel (YK5522)
                                               888 Seventh Avenue
                                               New York, NY  10019
                                               Telephone: (212) 989-9113
                                               Facsimile:  (212) 989-9163
                                               Email:  scott@bursor.com
                                                          jmarchese@bursor.com
                                                          ndeckant@bursor.com
                                                          ykopel@bursor.com

                                               *Attorneys for Plaintiffs*