E9BKEBIM

1  UNITED STATES DISTRICT COURT

2  SOUTHERN DISTRICT OF NEW YORK
   ------------------------------x

3
   JOSEPH EBIN, ET AL.,
4
                  Plaintiffs,
5
            v.                          14 CV 1324 (JSR)
6
   KANGADIS FAMILY MANAGEMENT, ET
7  AL.,

8                 Defendants.

9  ------------------------------x
                                     New York, N.Y.
10                                   September 11, 2014
                                     10:40 p.m.
11
   Before:
12
                      HON. JED S. RAKOFF,
13
                                         District Judge
14
                         APPEARANCES
15
   BURSOR & FISHER P.A.
16      Attorneys for Plaintiffs
   BY:  SCOTT A. BURSOR
17       JOSEPH MARCHESE

18 KLESTADT & WINTERS LLP
        Attorneys for Defendants
19 BY:  JOHN JURELLER
        LAUREN C. KISS
20

21

22

23

24

25

E9BKEBIM

```
1              THE DEPUTY CLERK:  This is Ebin & Jenkins versus the

2   Kangadis Family Management, Docket No. 14 CV 1324.  Will

3   everyone be seated and will the parties please identify

4   themselves for the record.

5              MR. BURSOR:  Good morning, your Honor.  Scott Bursor

6   for the plaintiffs.

7              THE COURT:  Good morning.

8              MR. MARCHESE:  Good morning, everyone.  Joseph

9   Marchese for the plaintiffs.

10             MR. JURELLER:  Good morning, your Honor.  John

11  Jureller from Klestadt & Winters on behalf of the defendants.

12             THE COURT:  Good morning.

13             MS. KISS:  Good morning, your Honor.  Lauren Kiss from

14  Klestadt & Winters on behalf of the defendants.

15             THE COURT:  Thank you for putting up with my

16  scheduling difficulties, but I think it's all for the best

17  because I have now an uninterrupted two hours, and that will

18  give us plenty of time to discuss any interesting issues.

19             Let's start with the motion to dismiss, and let me

20  hear from moving counsel.

21             MR. JURELLER:  Thank you, your Honor.  Again, John

22  Jureller on behalf of the defendants.  This is the defendant's

23  motion to dismiss what we have been calling the second

24  complaint in this matter.  Everything has been, obviously, laid

25  out for you in the papers.  Essentially there are four
```

E9BKEBIM

1    arguments that we have asserted with subarguments but four main

2    arguments, one being law of the case, one being the bankruptcy

3    court decision dated July, I think, 28th, 2014, one being the

4    complaint's failure to state causes of action against the two

5    individuals on the alleged or purported direct claims, and then

6    the remaining argument is that the bankruptcy court is the

7    proper forum.

8              I'll get into each of those.  Defendants' basic

9    argument here is, your Honor, you already decided the motion to

10   dismiss against the KFI or Kangadis Food, which we have been

11   referring to as KFI, as the underlying company, you've already

12   decided that, therefore you should decide this because they're

13   the same claims.  But these are not the same claims; these are

14   claims against the individuals in their capacities as either

15   members or officers or directors of the company or, in the case

16   of Kangadis Food Management --

17             THE COURT:  Yes, I've read it.  It's not the same

18   motion.

19             MR. JURELLER:  Not the same?

20             I want to point that out.  These are veil-piercing

21   claims, purported direct claims which we believe are

22   veil-piercing claims as well.

23             The entire premise of this case is, KFI's, the

24   corporation's, alleged misbranding its sale of olive pomace oil

25   as Capatriti 100 Percent Olive Oil.  I think after we get

E9BKEBIM

1    through these arguments, your Honor, I believe you will find

2    that the complaint fails to state a cause of action and should

3    be dismissed.

4           One other thing I want to note before we get into the

5    different arguments in detail is that all discovery on this

6    matter, with the exception of very limited discovery for the

7    defendants on these supplemental claims, all discovery has been

8    complete pursuant to your directive at the last conferences,

9    and it was complete at the time that this second complaint was

10   filed.  So all the information that was available was out there

11   and available to the plaintiffs when they filed this complaint,

12   and I think that's important to note from the outset.

13          Starting on the arguments, the first argument, your

14   Honor, is the law-of-the-case argument.  Basically, this Court

15   has already seen this issue and decided this issue on two

16   occasions.  In the KFI case, the prior case against the

17   corporation, which was stayed through the bankruptcy, the

18   plaintiffs attempted to add the four parties that we have here

19   and four defendants --

20          THE COURT:  Yes, and I said hold off because it may be

21   mooted.  And that was in the context of that case going to

22   trial and I didn't want to delay that trial.  But, of course,

23   then the defendants put the company into bankruptcy.  So I

24   don't see that being law of the case at all.  And of course law

25   of the case, in any event, doesn't bind this Court because I'm

E9BKEBIM

| 1 | always free to change my mind.  But in any event, I do not see |
| 2 | that as being law of the case. |

3        MR. JURELLER:  OK.  On June 10th, in your order of

4   June 10th -- well, backing up, there was a second order, on

5   April 18th, and what you stated in that order -- this was now a

6   new case being brought against these same defendants -- you

7   stated that this action was dismissed, you closed the case,

8   without prejudice to be refiled if appropriate upon resolution

9   of the related case against the company.  And the reason why --

10  if I may?

11        THE COURT:  Go ahead.

12        MR. JURELLER:  The reason I bring that up, your Honor,

13  is because what the decisions were -- and there was no basis,

14  no full memorandum that was written by the Court, but what the

15  decisions were -- they followed New York law -- under New York

16  law, with respect to piercing-a-veil claim, it is incumbent

17  upon having, number one, the corporation in the case and

18  finding a liability against the corporation --

19        THE COURT:  Well, if you're right about New York law

20  and you have your separate veil-piercing argument, which we're

21  going to turn to, I think, momentarily --

22        MR. JURELLER:  Right.

23        THE COURT:  -- but to the extent you're making an

24  argument that this was a determination of that issue, I

25  respectfully disagree.  I've consulted with the judge who made

E9BKEBIM

1    that decision, namely me, and he tells me that that was not his

2    decision.

3             So we need to move on from the law-of-the-case

4    argument.

5             MR. JURELLER:  OK.

6             And just one other point on your June 10th order,

7    where you allowed the claim to be filed -- and I am not going

8    to harp on this -- you did acknowledge in that order that these

9    claims were derivative of the claims against the company but

10   circumstances have changed.  And the reason I bring that up is

11   that leads to the next point on this issue, is that

12   circumstances really have not changed.

13            At the time, the bankruptcy had just been filed.  When

14   the Court had indicated that the circumstances had changed, it

15   didn't indicate what it was -- we assumed it was the

16   bankruptcy's filing changes the circumstances.  However, now

17   that everything has now sort of played itself out, we have the

18   bankruptcy which is moving along, we have a plan of

19   reorganization in place.  The bankruptcy was filed, and

20   acknowledged it was filed, because of potential liability

21   related to this case, so we don't have a company that's gone

22   out of business.  The plan, as filed with its disclosure

23   statement, will have a distribution to creditors, including if

24   the class claim is allowed, to creditors in the class.

25            So that's one point that has brought the case back

E9BKEBIM

1    to -- the circumstances really haven't changed here, because we

2    have a corporation that's going through the bankruptcy process.

3                THE COURT:  No, I think you're missing the central

4    point.  There is a public interest, a strong public interest,

5    in moving litigation along.  I think it's well recognized that

6    perhaps the single greatest flaw of the Anglo-American legal

7    system, as practiced in the United States in the 20th and 21st

8    Centuries, is the extensive delay.  And this Court, therefore,

9    has sought, within the requirements of law, to bring to a

10   resolution, through trial or otherwise, the factual issues, the

11   determination of what the truth is in this situation, so that

12   the parties can know it and so that the public can know it.

13               I have no idea of what motivated the going into

14   bankruptcy, and I am pleased to hear that it's moving along,

15   but that cannot be the tail that wags the dog.  If there is,

16   and we're going to hear more arguments on whether there is, but

17   if there is a viable case against these defendants, and given

18   that, as you correctly point out, discovery with very limited

19   exceptions has long since been concluded, the matter ought to

20   be brought to a prompt resolution and not delayed further

21   because of whatever is going on in another proceeding in

22   another court.

23               So I'm happy to hear you tell me what's going on in

24   the bankruptcy court -- I'm always happy to get updates about

25   that -- but we have a lawsuit unless it is not a lawsuit

E9BKEBIM

1   because it should be dismissed but we otherwise have a lawsuit,

2   the lawsuit is ready to be brought to trial, it will be brought

3   to trial on, I think the date is November 3rd, if I'm

4   remembering correctly.  Long experience suggests that what's

5   going on in the bankruptcy court will not move at anything like

6   that rapidity.

7              But go ahead.

8              MR. JURELLER:  Your Honor, understood.  What I am

9   setting up for you, just because there's so much in this case,

10  is sort of the foundation of the argument that we're going to

11  present to you here.  We have a bankruptcy which is moving

12  along, and, again, as a status update, that's what's happening.

13             We also have a situation where the class plaintiffs

14  have now filed a proof of claim for 260-million-odd dollars in

15  the bankruptcy court, and where this goes with respect to this

16  entire --

17             THE COURT:  How could they not?  That's the parallel

18  to the action that's been stayed, correct?

19             MR. JURELLER:  Understood.  And with respect to the

20  piercing the veil, under New York law, there is no separate

21  cause of action --

22             THE COURT:  But that's where I think you're in

23  stronger ground.  So I think we really ought to turn to that

24  and forget law of the case.

25             MR. JURELLER:  That's fine, your Honor.

E9BKEBIM

1          Moving on to that point, under New York law, the law

2     does not recognize a separate cause of action for a piercing of

3     the veil.  A claim for piercing the veil against an officer,

4     director, member, principal presupposes a liability on the

5     corporation itself.  The cases that have been cited indicate

6     that you must have the corporation -- if you look at all the

7     cases cited by all the parties, the corporation is an integral

8     part of that because it assumes the liability, basically you

9     are imputing the liability onto the --

10          THE COURT:  I am, at first blush, persuaded that that

11     is a correct reading of New York law.  So I think you can

12     assume on that argument that at the moment I'm in agreement

13     with you, but I of course want to hear from your adversary.

14     But you can move on, not because, as in the first instance, I'm

15     unpersuaded but, rather, in this instance, as to the argument

16     you're now making, I am persuaded.

17          MR. JURELLER:  And I appreciate that.  Thank you for

18     telling me that.

19          Even assuming -- and I'm not sure what counsel is

20     going to say -- that you could bring a piercing-the-veil claim

21     without having the corporation -- which New York law is pretty

22     clear on, I think it's pretty established -- as you said, there

23     are actually no allegations, in the complaint anyhow, that meet

24     the level of piercing the veil.

25          First of all -- and I think this is very important --

E9BKEBIM

at this date there's really no allegations against Ms. Mahi

Andromahi Kangadis -- we have been calling her Mrs. Mahi,

that's how she's been defined, who's one of the members --

there's no allegations in the complaint, period, other than

she's a member.

        Second, there's no allegation again Kangadis Family

Management, KFM, at all other than that there is a similar

ownership structure -- Kangadis Family Management owns solely

the real property where this operation is based -- and there's

no allegation of commingling, there's no allegations of

anything as to this single-purpose entity having anything to do

with KFI, other than owning the real property, nothing is

alleged.  And I think that's very important to state as well.

        With respect to the other allegations for piercing the

veil, the only thing that's alleged is that one of the members

took distributions from the company.  There's no allegations

that these distributions were improper, there's no allegations

that these distributions were not correctly documented, and

there's no allegations of anything improper with respect to

this in the complaint at all.  And that's as to Mr. Themis

Kangadis.

        As to Mr. Aris Kangadis, there's no allegations of any

commingling of any distributions of anything, period, with

respect to him.  So even if the Court were to look at the

piercing-the-veil claims, which, again, we believe don't stand

E9BKEBIM

1    on their own, but even if the Court were to look at it, there's

2    nothing in the complaint at all that even gets close to the

3    burden of piercing the corporate veil.

4           Oh, the other point that was brought up is that there

5    was no shareholder/stockholder meetings on a regular basis.

6    This is a closely-held company, owned by a father, mother and

7    son -- the son operates the operations -- and that in itself is

8    not sufficient to get past it.

9           So with respect to piercing the veil, we believe all

10   the claims, number one, can't be run on their own; number two,

11   the burden is not met in the complaint itself.  There's

12   nothing, there's no plausible way the Court could see this

13   company as being a sham set up solely for these operations.

14   It's been operating for years, it has other products, and

15   there's nothing in here that even meets the burden of showing

16   that allegation that's set forth in the complaint.

17          Next argument that we have with respect to the

18   piercing-the-veil claims, your Honor, putting that which we

19   just argued aside, is, it's our understanding that the

20   bankruptcy court, in their order of July 28th, 2014, has

21   already indicated quite clearly that piercing-the-veil claims

22   are stayed by the automatic stay.

23          THE COURT:  Of course I don't have to reach that issue

24   if I agree with the argument you've just made a minute ago, but

25   I'm not so sure that's right.  The Court, the bankruptcy court,

E9BKEBIM

1   Judge Grossman, said -- this is from the end of his opinion --

2   "The class action complaint contains allegations that the

3   principals harmed the class action plaintiffs based on their

4   own conduct.  While piercing the corporate veil seems a

5   necessary component of finding liability against the individual

6   insiders, the class action plaintiffs claim that this is not

7   the case.  This will be their burden to prove before Judge

8   Rakoff at the trial scheduled for November 2014.  To the extent

9   their claims rely on piercing the corporate veil of the debtor,

10  the class action plaintiffs are aware of the consequences, as

11  they appear to have read, and to have cited to, this Court's In

12  Re Pitts decision in their brief."

13          Now, I'm not quite sure what Judge Grossman meant by

14  that, but I went back and looked at Judge Grossman's decision

15  in Pitts -- which of course is not binding on this Court in any

16  event but I certainly look at it for its persuasive

17  authority -- and that was the reverse situation.  It doesn't

18  seem to have been this situation at all.

19          The discussion in Pitts, the more general discussion,

20  also turned predominantly on a discussion of a Fourth Circuit

21  case, again not binding on this Court but certainly something I

22  need to look at, A.H. Robins Company versus Piccinin, 788 F.2d

23  994, (4th Cir. 1986), which began by stating the general rule

24  that the automatic stay does not apply to nondebtors but then

25  stated an exception to that rule specifically, as Judge

E9BKEBIM

Grossman says in Pitts, "In A.H. Robins, the Court of Appeals

from the Fourth Circuit found that in unusual circumstances the

automatic stay can be extended to actions against nondebtors."

He then goes on to discuss the facts of A.H. Robins, which are

very different from the case here.

          And then, finally, he makes reference to a Second

Circuit case, which of course is binding on this Court, and is

that is in the case of Queenie Ltd. versus Nygard

International, 321 F.3d 282 (2d Cir. 2003), where, as Judge

Grossman says, the Court of Appeals for the Second Circuit

concluded that the automatic stay applied to an action

commenced against inter alia a nondebtor corporation, which was

wholly owned by an individual Chapter 11 debtor, again, the

reverse of the situation here.

          So I see nothing in what he said, either in the one

snippet from his decision in the bankruptcy here that you cite

or in the authority that he is citing, that suggests that he

made a determination, which in any case would not be binding on

this Court, that the plaintiffs were precluded under,

apparently, threat of being accused of violating the automatic

stay, of bringing veil-piercing and alter ego claims against

the individuals.

          Now, that is totally separate and apart from the

earlier argument you made, which I've already indicated I'm

tentatively leading towards adopting, which says New York law

E9BKEBIM

1    would not permit those claims to be brought in this situation.

2    But I really don't see that you can read as much as you

3    apparently are reading into that one sentence of Judge

4    Grossman's decision.

5         MR. JURELLER:  As you said, your Honor, this is an

6    alternative argument that we had which supplements our previous

7    argument that piercing the veil is -- quite clearly cannot

8    clearly brought in New York.  The reason we read this a little

9    differently and why we read this as being applicable is:

10   Number one, what the judge does is he separates, in our

11   opinion, the direct claims against the individuals and the

12   derivative claims.  And the way we read Pitts, understanding

13   the two cases that you brought up as well, which allows the

14   state to be applied to nondebtors in certain exceptional

15   circumstances, but the way we read Pitts is that the derivative

16   claim has an effect on -- whether it's individual corporation,

17   corporation/individual, obviously it's the opposite in our case

18   right now, but if the derivative claim is going to have an

19   effect on the debtor, so, again --

20        THE COURT:  Well, I agree with you that the question

21   of effect is part of what's involved, and you have to

22   distinguish there between necessary effect and potential

23   effect.  A case that neither side cited but I think is relevant

24   is the Second Circuit's recent affirmance of Judge Marrero and

25   me in one of the Madoff cases.  And the issue there that would

E9BKEBIM

1   involve different provisions of the bankruptcy code, the claim

2   was made by the Madoff trustee that the automatic stay

3   prevented claims being brought by New York State and others and

4   a settlement that was ultimately made in those cases because

5   the depletion of the feeder funds' assets to pay the

6   settlements would make less available for the claims that the

7   trustee had brought in bankruptcy against the feeder funds.

8   And the Second Circuit rejected that argument, saying our

9   precedent shows that where the claim against the third party

10  will necessarily affect the capacity of that same third party

11  to make a payment in the bankruptcy court, the stay will apply,

12  but where it's just a possibility, a factual possibility but

13  not a legal necessity, then the stay will not apply.

14          I think that's very roughly analogous here.  Any

15  judgment that might be rendered against the individuals in this

16  lawsuit might, although it seems to me doubtful, affect the

17  ability of the corporation to pay in bankruptcy, though that's

18  extremely unlikely but it's only possible it would be if the

19  alter ego claims were established in the bankruptcy court.  So,

20  otherwise, limited liability would obviously say that the

21  owners can't be liable for the debts of the corporation or the

22  liabilities of the corporation.

23          So if a judgment is rendered in this case against the

24  individuals, it would only impact the ability of the

25  corporation in bankruptcy to pay any judgments that might be

E9BKEBIM

1   rendered against it if the corporation was otherwise not able

2   to pay those liabilities, if, after a determination that

3   probably will never be made in the bankruptcy court, alter ego

4   or veil-piercing was established, et cetera, et cetera,

5   et cetera.

6           So I do not see these cases as precluding the action

7   here or affected by the automatic stay.

8           MR. JURELLER:  If I may just add one point to that,

9   your Honor?

10          THE COURT:  Sure.

11          MR. JURELLER:  And then we'll move on.  I don't want

12  to beat up this point.

13          I think the way we saw it -- and we understand that

14  point about being able to pay or not pay and necessity versus

15  potential down the road, but what I think the Court was getting

16  at here, because it was speaking directly about these

17  piercing-the-veil claims, these alter ego claims, is that

18  you're bringing in a claim against officers in this case,

19  officers/directors, outside of the bankruptcy, now those

20  claims, because of New York law, presuppose the liability of

21  the corporation itself, so really --

22          THE COURT:  That's really your first argument.  And as

23  I say, I certainly want to hear from your adversary, but that

24  argument seems to me to have a lot of weight.  It's an

25  interesting argument, this backup argument, this fallback

E9BKEBIM

1  argument, but it may be the Court will not have to reach it in

2  any event.

3          MR. JURELLER:  Let me segue into the next argument.

4  How about that?

5          THE COURT:  OK.

6          MR. JURELLER:  The way the complaint has been pled,

7  each of the six causes of action -- express warranty, breach of

8  implied warranty, New Jersey Consumer Fraud Act, the General

9  Business Law under New York, fraud and negligent

10  misrepresentation -- six causes of action were brought against

11  all four of the individuals under the piercing-the-veil claim.

12  We've just discussed that.  Putting that aside now for the time

13  being.

14          THE COURT:  Now we're talking what's against the

15  individuals?

16          MR. JURELLER:  Right.  Without any distinction, the

17  claims have now been brought as well against Themis Kangadis,

18  Themis and Mr. Aris Kangadis, Mr. Aris for direct --

19          THE COURT:  Forgive me.  My law clerk says that she

20  thinks -- and you have to understand the hierarchy of chambers,

21  I'm merely her vessel carrying out her wishes in all

22  respects -- she thinks that it would make more sense to hear

23  from the plaintiffs on this veil-piercing stuff before we move

24  on to the direct claims.  That sounds right to me too, so let's

25  hear from them and then we'll come back to you in a minute.

E9BKEBIM

1              MR. JURELLER:  Thank you, your Honor.

2              MR. BURSOR:  Thank you, your Honor.

3              The question that the Court seems to be focused in on

4    is whether there's a requirement under New York law to have a

5    judgment against the corporate entity as a precondition to

6    piercing the veil and attaching liability --

7              THE COURT:  Yes, or the functional equivalent thereof.

8              MR. BURSOR:  So we cited two case cases from the

9    Southern District of New York, Variable Parameter and its --

10             THE COURT:  Yes, so let's talk about that.  Hold on

11   just a minute.

12             Variable Parameter is California law, is it not?

13             MR. BURSOR:  That was Judge Chin --

14             THE COURT:  Is it not his application of California

15   law?

16             MR. BURSOR:  Yes.  It was Judge Chin.

17             THE COURT:  So what does it have to do with this case?

18   Their argument is under New York law.

19             MR. BURSOR:  I understand that, your Honor, and I

20   don't believe there's a distinction between California and

21   New York law on this point.

22             THE COURT:  Well, that's not self-evident to me.

23             MR. BURSOR:  I agree that is not self-evident, and I'd

24   like to --

25             THE COURT:  The other case you also cited, a Second

E9BKEBIM

```
 1   Circuit case, which was St. Paul Fire & Marine versus PepsiCo,
 2   which is about Ohio law.  Being perfectly frank, I was a little
 3   disappointed that you did not come to grips in your brief with
 4   the fact that both of the cases that you are relying on deal
 5   with the law of other states.  Anyone who has looked remotely
 6   into the body of law regarding alter ego and veil-piercing
 7   knows that there is considerable differences between states,
 8   sometimes radical differences, between states as to what is
 9   required and what the law is in those areas.
10        So one cannot make the leap that because a court says
11   something is the law of Ohio or California, that it's the law
12   of New York.
13        MR. BURSOR:  Your Honor, we also cited the Levesque v.
14   Kelly case.  It was a Southern District of New York case.  It's
15   cited on page 4 of our opposition brief of the motion to
16   dismiss.  And --
17        THE COURT:  I haven't taken a look at that, but let me
18   see.  That was New York law?
19        MR. BURSOR:  Your Honor, I'm just looking at the
20   parenthetical in my brief, and it does not indicate which
21   state's law it was.  But I want to make a few points with this,
22   and we should take a look at the Levesque case and check it.
23        THE COURT:  Well, I'll have my law clerk do that now.
24        MR. BURSOR:  So, your Honor, the critical point, I
25   think, is that we did not see any case from New York that says
```

E9BKEBIM

1    you cannot proceed with a veil-piercing claim against a

2    shareholder of --

3             THE COURT:  Well, there's a decision that your

4    adversary cites that says that veil-piercing is an equitable

5    remedy that "assumes that the corporation itself is liable,"

6    and then imposes the corporation's obligations on its owners or

7    alter egos.

8             So that seems, while it's not exactly a holding, it

9    seems to be an assertion by the highest court of New York that

10   these are in effect derivative implications.  As a logical

11   matter, given New York's long, long history of, in the

12   corporate law area, taking a very conservative common-law type

13   of approach -- not at all like California, for example -- if

14   you look at the corporate law of California, as a general

15   matter, it could not be more different from New York, which may

16   account for the fact that there are many more corporations who

17   are incorporated in New York than in California.  The closest

18   analogy to New York law would be Delaware law.

19            But given that, I think the assertion that I just read

20   from the Morris case is interesting, the citation, for our

21   court reporter's benefit, is Morris versus New York State

22   Department of Taxation and Finance, 82 N.Y.2d 135, 1993.

23            There's also cited by your adversary the Second

24   Department's decision, New York State Second Department's

25   decision, in Hart v. Jassem, 43rd A.D.3d 997, that, New York

E9BKEBIM

1    "does not recognize a separate cause of action to pierce the

2    corporate veil."

3              Now, I concede that those cases, if you look at them,

4    are not absolutely dispositive of the issue, but in the absence

5    of anything to the contrary in New York law, they are, at the

6    very minimum, suggestive, are they not?

7              MR. BURSOR:  No, your Honor, I don't think they are.

8    And I'd like to address each of those cases and also the two

9    that we cited.

10             Let me say that I think there is more than one type of

11   veil-piercing claim.  There are veil-piercing claims, for

12   example, of the type that the New York Court of Appeals was

13   discussing in Morris, where a creditor comes in and says, the

14   corporation has some obligation and we want to impose that

15   obligation on you.  I think that is one type of veil-piercing

16   claim.

17             I think the veil-piercing claim that we have here is

18   quite different from that type of claim because the allegation

19   in this lawsuit, your Honor, is that the shareholders of these

20   two corporations, KFI and KFM, created those corporations for

21   an illegal purpose -- that's an allegation that's in our

22   complaint -- the illegal purpose of selling adulterated and

23   misbranded oils.  And the shareholders in the allegations here

24   are attempting to use the corporation to perpetrate a fraud and

25   to shield themselves from a fraud.

E9BKEBIM

1           So the Morris case was a scenario -- and I don't have

2    the facts at hand but I've --

3           THE COURT:  What is your evidence -- we are of course

4    on a motion to dismiss, not on summary judgment but discovery

5    is completed -- what is your evidence that the reason they

6    created the corporation was for an illegal purpose, as opposed

7    to saying that the corporation undertook to advertise their

8    goods or whatever, engaged in fraudulent misrepresentations?

9           MR. BURSOR:  Well, I'd like to break the answer to

10   that question down in two parts.  The first part is, we've

11   alleged it in the complaint -- and this is a motion to dismiss

12   so our allegations --

13          THE COURT:  That's true, but we're going to be talking

14   before today is over about summary judgment so we might as well

15   find out whether there is any evidence out there.

16          MR. BURSOR:  So, your Honor, the evidence to support

17   that allegation is, we have very detailed allegations in the

18   complaint -- and when I say allegations, they're supported by

19   citations to depositions and the like but they're

20   allegations -- that this company has for a period of more than

21   seven years committed millions of acts of misbranding, not only

22   to Capatriti 100 Percent Pure Olive Oil but other brands of

23   olive oil, for example, the Porto extra virgin oil.

24          THE COURT:  But the argument you're making, if I

25   understood it, is that the reason this veil-piercing claim is

E9BKEBIM

1    different from the more traditional veil-piercing claim is, in

2    the traditional veil-piercing claim a company that does

3    something wrong, if found liable, its liabilities can then be

4    imputed to the owners if they requirements of alter ego or

5    veil-piercing are met.

6              You're saying those cases are distinguishable because

7    here the corporation was created ab initio, the two

8    corporations were created ab initio, for the purpose of

9    concealing or aiding or carrying out the fraudulent scheme.

10   And I am still not hearing any evidence of that.

11             MR. BURSOR:  Well, our position is a little bit

12   different than that, your Honor.

13             THE COURT:  OK.

14             MR. BURSOR:  We allege the corporations were created

15   for this purpose, but also we allege they were used for this

16   purpose, and that the corporations were used to conceal --

17             THE COURT:  But if that's the distinction, then it's a

18   distinction without a difference, because an alter ego or

19   veil-piercing allegation normally assumes complete control over

20   the corporation.  So in any case in which a corporation

21   committed a tort, the claim could be made that it was really

22   being used as a screen to screen the ownerships from liability.

23   That's why you have the veil-piercing doctrine or the alter ego

24   doctrine -- that's among other reasons -- but that does not

25   distinguish the cases that your adversary is relying on.

E9BKEBIM

1              MR. BURSOR:  Well, not all veil-piercing cases are

2     going to be tort cases, your Honor.

3              THE COURT:  That's true.

4              MR. BURSOR:  And that's why I was trying to describe

5     the distinction between --

6              THE COURT:  This doctrine doesn't apply to tort cases

7     generally?

8              MR. BURSOR:  No, what I think is that veil-piercing --

9     it's not a legal doctrine, it's an equitable doctrine, it's

10    used in equity as a way to avoid having the corporate form used

11    to facilitate fraud.

12             THE COURT:  By the way, just while I'm thinking about

13    it, to the extent your claims are veil-piercing claims, they

14    would be for the Court, not the jury?

15             MR. BURSOR:  Actually, that's not correct, your Honor.

16    We took a look at this -- and I don't have the research at

17    hand.  I know in California, because I've tried veil-piercing

18    cases in California, that's correct.  In I think the Second

19    Circuit, I think the law is that veil-piercing claims go to the

20    jury at least for factual findings.

21             So the law is a little bit all over the place on this,

22    and I am sure that's something we will address before

23    November 3rd, as to whether those are tried to the jury.

24             THE COURT:  Would it be a question of federal law or a

25    question of New York State law?

E9BKEBIM

1           MR. BURSOR:  I don't know the answer to that right

2    now, I don't know the answer to that.  That's something that we

3    can certainly address.

4           But, your Honor, I think the second point I want to

5    make about veil-piercing, and why I think the Variable

6    Parameter and the Levesque cases, whether they were applying

7    California law or another body of law than New York law, why I

8    think they're particularly persuasive here is, the procedural

9    setting was identical, because you had veil-piercing claims

10   against the shareholder and claims against the corporation

11   going forward at the same time.

12          And there are many cases in New York law where you

13   have -- in fact, a couple of the cases that the defendants

14   cite, Hart v. Jassem and Rotella, you have the same scenario

15   you have the claim against the corporation going forward at the

16   same time as the veil-piercing claim.

17          Now, it were true that New York law has this

18   hard-and-fast rule that the Morris case doesn't say and no

19   other New York case says, but if it were true that there's this

20   rule that you need an obligation of the corporation before you

21   can seek to pierce the veil, then you could never have those

22   claims litigated together because the veil-piercing claim would

23   be subject to dismissal because the plaintiff would be unable

24   to plead an obligation of the corporation as a prerequisite to

25   piercing the veil at the time, at the same time, prior to

E9BKEBIM

having the resolution of the corporation's obligations adopted.

But I think the most important point, your Honor, the most important point is that if that were the rule, if that were the rule, it would open up a pretty significant loophole for the perpetrators of fraud to use to try to shield themselves, because what they could do, they could do what the Kangadis company did here to give themselves blanket immunity. They could say, we're going to use the corporation to perpetrate a fraud, when we get sued we're going to put the corporation into bankruptcy, and the bankruptcy will shield us from any alter ego liability as well, because we all know there's very unlikely to be any resolution of the bankruptcy that results in a finding against the corporation.  And if there is some payment from the bankrupt entity as a result of the reorganization, it's going to be greatly diminished because the bankruptcy court, of course, is a court of equity, the claims get reduced, you know, we're very likely to get crammed down in the bankruptcy.  So you would have a scenario --

THE COURT:  Well, I understand that is a possible practical implication, but it's one brought about by bankruptcy practice.  This is a question of New York law.  New York law almost never considers bankruptcy practice because there is no state bankruptcy.

MR. BURSOR:  Correct.

THE COURT:  So what you are asking me to do, in

E9BKEBIM

1    effect, is say I should read New York law differently from how

2    it might otherwise be read because of the implications or the

3    loophole it could create given federal bankruptcy, not law, but

4    federal bankruptcy practice.

5            It's hard to believe that that would have been in any

6    way, shape or form in the minds of the New York courts when

7    they addressed this issue; and, therefore, I'm not sure that I

8    can consider it.

9            MR. BURSOR:  That's not what I am arguing, your Honor.

10           THE COURT:  OK.

11           MR. BURSOR:  I'm arguing that New York law is not, as

12   Mr. Jureller described it, New York law is not -- the dictum

13   that has been pulled from the Morris case is not a statement of

14   the point of New York law that Mr. Jureller has asserted it is.

15   The dictum from the Morris case deals with a different type of

16   veil-piercing claim.  And the Morris case was not dealing with

17   the scenario where you have a claim against the corporation

18   that is unresolved and unlikely to be resolved at the same time

19   there are veil-piercing claims being brought.

20           Now, the case that does address that, the New York

21   case that does address precisely that scenario, is the Hart

22   case, which Mr. Jureller cited.  And the Hart case is like this

23   case, it's like this case was before there was a bankruptcy

24   filed, because in the Hart case there was a pleading that said,

25   plaintiff said, we have claims against this corporation and we

E9BKEBIM

1     want to pierce the veil and get at the shareholders.

2              Now, the shareholders moved to dismiss.  And what the

3     Hart case said, the part that Mr. Jureller cites from Hart is,

4     the Hart case says there's no separate cause of action in

5     New York law to pierce the veil.  Of course that's correct, but

6     that has nothing to do with this case.

7              So the part of the Hart case that does have something

8     to do with this case is the Hart case's denial of the motion to

9     dismiss with respect to the veil-piercing claims against the

10    shareholders at a time when the liability of the corporation

11    had yet to be determined.

12             So when Mr. Jureller cites the Morris case --

13             THE COURT:  All right, that's a fair part.  I want to

14    go back and, actually, I think -- first of all, let me find out

15    from my law clerk, the other case you cite, Levesque, whatever

16    the name was, what state's law that is.

17             THE LAW CLERK:  I don't actually think it's directly

18    on point.  It is New York law but it's a particular instance in

19    which his --

20             THE COURT:  All right, so Judge Jing has ruled it's

21    not on point but that it is New York law.  I'll take a look at

22    it, however.

23             But I think your point about Hart does give me some

24    pause.  I do want to go back and look at Hart.

25             MR. BURSOR:  And, your Honor, if I may, on Levesque,

E9BKEBIM

1    when you do go back and take a look at Levesque, the reason we

2    cited it and that we think it's on point is because if you look

3    carefully at Levesque, it was a case where the corporate entity

4    had filed a bankruptcy and there were veil-piercing claims that

5    were continuing in the Southern District against the

6    shareholders.  And the shareholders made a motion for summary

7    judgment, and that motion was denied.

8         And I believe there's a statement -- I'm a little hazy

9    but I believe there's a statement, the trial will go forward.

10   It was summary judgment denied, and the judge made a statement

11   something like, the trial will go forward but summary judgment

12   denied --

13        THE COURT:  Probably not the most elaborate discussion

14   of your point, in any event, and this is a case, again, that is

15   not binding on me, although of course I'm going to look at it.

16        The case that is in some sense binding on me is Hart,

17   so I do want to go back and look at Hart.  The rule, of course,

18   is I have to -- unless I determine that Morris has settled the

19   issue, I then have to figure out what the New York Court of

20   Appeals would hold, and I look then and give considerable

21   weight to what the lower New York courts have determined.  That

22   that's why Hart is very important.

23        MR. BURSOR:  Right.  And, your Honor, I just want to

24   be completely fair on this point.  I don't believe Hart was

25   dealing with a bankruptcy situation, it was dealing with a

E9BKEBIM

1    situation where the claims were pled together and just the

2    claim against the corporation had yet to be resolved.

3         THE COURT:  All right.  Let's go back to your

4    adversary for rebuttal on this point and then we will move on

5    to other points.

6         MR. JURELLER:  Sure, your Honor.  And I think you got

7    it the first time with the way that New York law is set up.

8    You need to have -- the whole idea behind this is, the

9    corporate liability is imposed on the members, principal

10   shareholders, officers, directors, you have to have corporate

11   liability, you can't have a shareholder who's liable and not

12   the company, whether they're brought together, whether they're

13   brought separate.  You always have to have the company

14   involved.  And I think if you look at every case that's

15   involved, the corporation is part of that case.

16        With respect to the cases that were cited by the

17   plaintiffs, interesting -- putting aside the fact that they're

18   not New York law except for Levesque, one of the interesting

19   parts of that is that there also is judgment against the

20   companies.

21        THE COURT:  I guess their argument -- forgive me for

22   interrupting, and then I want to have you continue about

23   Levesque, but as I understood the argument -- and this was not

24   the entirety of their argument but part of it -- it is -- OK,

25   what's the purpose of a corporation?  It is, among other

E9BKEBIM

things, to limit your liability.  But the common law and the

law of every jurisdiction has long since recognized that that

can't be a way to avoid liability for acts that are essentially

the acts of individuals that are simply operating under a

corporate front, for lack of a better word; and therefore you

have alter ego and veil-piercing doctrines.

That varies considerably from state to state but

there's no state that doesn't have some version of it.  And I

think the biggest difference, from my recollection of other

cases I've had between the states, one that's not really

relevant here, in some states you can have alter ego and

veil-piercing regardless of whether a fraud is being used for a

fraudulent purpose as long as domination and control are

complete.  In other states, even if domination and control are

complete, you also have to have it being a fraudulent purpose

being involved before you can have alter ego and veil-piercing

liability.  Here, of course, they're alleging fraudulent

purpose.

So the argument goes, since the whole purpose of alter

ego and veil-piercing is not to allow the corporate structure

to be just simply a front for activities that for all practical

purposes are being undertaken in your individual capacity,

therefore, that would be undercut if you could, by taking the

corporation into this front, into bankruptcy, then get a

benefit that you otherwise would not have under state law

E9BKEBIM

because of the automatic stay permissions, that the automatic

stay permissions should apply in those situations because it's

not really about the corporation at all, it's all about the

acts of the individuals.

So I may be overstating it and it's certainly not the

only argument they're making, but that, I think, is part of the

argument they're making.  So what about that?

MR. JURELLER:  Let me address, your Honor, a couple of

different points.  First and foremost, when the Court looks at

the complaint, the Court is going to see very, very clearly

that piercing the veil has not been sufficiently pled.  What's

pled is not plausible.  So that's point number one.

Point number two is, New York, law is extremely clear

that you must have -- a piercing-the-veil liability presupposes

liability against the corporation.  It's clear, the cases that

are cited by the plaintiffs are distinguishable in that there

already is a judgment against the corporation, so now you can

move on at that point.

If you look at Levesque, they already have a judgment

against the corporation, so now they, despite the corporation's

bankruptcy, they now can go forward because they have the

judgment already, you now have the liability already in order

to move to the shareholder.  That's the distinction on all the

cases that they cite.

With respect to the main point that your Honor just

E9BKEBIM

1    made, filing bankruptcy, to my knowledge, does not give anybody

2    who's committed a fraud an out.  If there's a piercing-the-veil

3    argument --

4            THE COURT:  It can be litigated in the bankruptcy

5    forum.

6            MR. JURELLER:  You can litigate it in bankruptcy,

7    after the bankruptcy, you can get your judgment in

8    bankruptcy --

9            THE COURT:  You're saying it doesn't extinguish any

10   claim; and, related to that, we have been talking about

11   creating loopholes, but all of these are exceptions to the

12   basic policy, which is, we want individuals, for the good of

13   the development of commercial activity, to be able to create

14   limited liability corporations so that they don't have to fear

15   that every act they take in their commercial activities will

16   subject them to individual liability, because if that were the

17   case, commercial activity would be a small fraction of what it

18   is otherwise.  So we shouldn't lose sight of the overall policy

19   of having corporations to begin with.

20           MR. JURELLER:  We all know New York has extremely

21   strong corporation policy, so that's the point we have to make.

22   And I think it's -- the Court looks at not only the pleadings

23   but also the case law on New York.  There's no rights that have

24   been taken away with the bankruptcy, but there also is no right

25   to bring the piercing the veil without the company first.

E9BKEBIM

1          THE COURT:  All right.  Let's move on to the

2     individual claims.

3          MR. JURELLER:  Your Honor, with respect to the

4     individual, as I was saying before we switched gears here,

5     there are six claims that have been brought, putting the

6     piercing the veil to the side, six claims that have been -- the

7     so-called -- one of the direct claims that have been brought

8     against Themis Kangadis and Aristidis Kangadis.  We have been

9     referring to Themis Kangadis' as Themis and Aris Kangadis as

10    Mr. Aris, just so that our argument complies and follows the

11    briefs.

12         THE COURT:  Let me, to help you out again --

13         MR. JURELLER:  Sure.

14         THE COURT:  -- and of course you'll be given an

15    opportunity to respond after we hear from your adversaries, but

16    my preliminary take -- none of this is binding on me, none of

17    this is law of the case, and I may change my mind tomorrow

18    before I decide these motions -- my preliminary take was that

19    the individual claims should be dismissed with respect to the

20    claims under the express and implied warranty claims, Counts

21    One and Two but should not be dismissed with respect to the

22    claims for breach of New York -- was it general obligation law,

23    whatever it is, Section 349 and the comparable New Jersey law

24    as well as common law fraud and negligent misrepresentations.

25    So, in other words, the way I was leaning was dismissing Counts

E9BKEBIM

One and Two but not Three, four, Five and Six.  But I'm

perfectly open to being persuaded either way on any of that.

          The point is, you may want to spend more time right

now on Three, Four, Five and Six.

          MR. JURELLER:  Well, why don't I put One and Two

aside, and I think those are pretty clear anyhow, and those

would have been the quicker of the arguments.  And I think even

if they were -- their case law is that they're a

piercing-the-veil case right now.

          Going to the claim for violation of New York General

Business Law 349, which is the deceptive practice law, again --

          THE COURT:  General Business Law, I think I said

general obligation law, but General Business Law is correct.

          MR. JURELLER:  -- in order to allege a claim, in order

to allege a claim under GBL 349, there must be an allegation

pled that the defendants -- and in this case we're talking

about Themis and Mr. Aris, the individuals -- made

misstatements or made omissions as part of this deceptive

practice.

          What I want to first point out, again --

          THE COURT:  Forgive me for interrupting.  In the

complaint, at paragraphs roughly 58 through 70, there are

allegations that the two individual defendants personally

directed employees to put pomace oil in mislabeled tins,

mislabeled as olive oil.  So I think that is where they're

E9BKEBIM

1    alleging arguably a violation of New York General Business Law

2    Section 349.

3              MR. JURELLER:  Right.  The plaintiffs make very clear

4    in their opposition that they have submitted 12 pages of

5    supplemental facts, but as we say in our reply, it's not the

6    volume here, it's the content that was put in there.  Just

7    because you say it's so, doesn't mean it's so.  And if you look

8    at those factual allegations or purported factual allegations

9    that are put in here, none of them meet the standard required

10   for cause of action Three, Four, Five or Six.  We're going

11   to -- maybe it's easy to talk about all -- at least talk about

12   the facts.

13             Let me go through -- I think it helps to go through

14   and shed some light on what's actually in here because there's

15   a lot of pages but there's not a lot of content.

16             Talking first about -- now, remember, there must be an

17   allegation of a misrepresentation or omission.  Talking about

18   Mr. Aris, Mr. Aris is the father who has -- and it's stated in

19   the complaint -- retired in 2005.  Essentially he goes to the

20   premises and walks around, and he's there, you know, but he's

21   the father, one of the members.

22             THE COURT:  Well, wait a minute.  I'm happy to discuss

23   what the discovery shows or fails to show, but right now we are

24   on a motion to dismiss.  So let me get my law clerk to give me

25   a copy of the complaint, and I want you to -- oh, sorry.  Very

E9BKEBIM

1    good.

2            MR. JURELLER:  That was a little bit of background,

3    your Honor.  I'll stick to the facts that are pled in here.

4            THE COURT:  Yes.

5            MR. JURELLER:  Again, after discovery has been

6    completed.

7            So with respect to Mr. Aris, what do we have in the

8    complaint?  We have allegations solely from a single employee,

9    who was there for eight months, Ms. Maria Annetti.  Ms. Marie

10   Annetti, the entire complaint against Mr. Aris is based upon

11   her testimony, Ms. Maria Annetti states she saw Mr. Aris

12   walking around the production floor, that she saw him directing

13   employees, that she saw him directing trucks come in and where

14   to put stuff in tanks.  That's what she said.

15           What she doesn't say is, when she saw him, how she saw

16   him -- she says she saw him from her office -- she doesn't say

17   where she heard, how she was able to see him, she doesn't say

18   what was in the trucks, what was put into the tanks, how that

19   fluid in the tanks, assuming it's fluid in the tanks, was used.

20   Now, remember there's different products here.  Whether that

21   particular fluid was put into the tin, whether that tin was

22   actually sold --

23           THE COURT:  No, I don't think you need that.

24           MR. JURELLER:  But I think you need some of that, your

25   Honor.  You need to show misstatements.  You can't just show,

E9BKEBIM

1    I'm sitting in my office and I'm watching someone on the floor

2    doing this with their hands, without knowing what was said and

3    what was going on.  And it doesn't go that far.  That's

4    after --

5           THE COURT:  I think you are confusing what's required

6    in a complaint as to what's required on summary judgment.  And,

7    of course, you're going to tell me later, but you still have

8    the opportunity to bring summary judgment, but more is required

9    in pleadings than used to be in a case, before Iqbal and

10   Twombly.  It doesn't require that you set forth in the

11   complaint the answer to every hypothetical objection that might

12   be raised and the obvious implications of what you are

13   alleging.

14          So in any complaint -- let's take it out of the

15   context of the this particular case -- if any complaint said, I

16   saw Joe direct John to do X, some improper thing, and you could

17   have a long debate, which would be very appropriate for summary

18   judgment or for the trial, about, well, what do you mean by you

19   saw him?  Did you hear him?  Did you interpret?  Was this a lay

20   opinion under Rule 701 of the Federal Rules of Evidence?  What

21   led you to that conclusion?  None of that is required in a

22   complaint.  That's the warp and woof of summary judgment.

23          So I don't --

24          MR. JURELLER:  I understand that, your Honor.  But

25   taking your example of, I saw Joe direct X to do X, what we

E9BKEBIM

1   have here in the complaint, we need more.  Joe -- we have

2   Mr. Aris directing some unnamed employee or some unnamed truck,

3   nondescript truck, to do something with some nondescript olive

4   oil or whatever product it was, but there's no connection.

5          Just because you allege that, I saw Mr. Aris point an

6   employee to do something, you need more.  There's other

7   products -- there's other things going on here, and there's no

8   details; again, it's just fluff at this point.  And you need to

9   have more, under these requirements -- probably especially when

10  we get into the fraud and the negligent misrepresentation

11  claims, it needs to be specific, you need to know what they

12  did, what they said, at the very minimum, how it relates to

13  this, not -- putting aside even that the requirements in the

14  GBL, and the requirements under New Jersey too, require actual

15  misstatements and omissions.

16         But by seeing somebody on the production floor point

17  someone somewhere, without hearing it, without knowing what was

18  being pointed to, it doesn't get us to the point that needs to

19  be pled in the complaint.  And that's the point that I was

20  trying to make here.  Yes, we don't need to have every single

21  detail, and we're clear on that, but we need to have sufficient

22  details.  And this does not have sufficient details as it

23  relates to Mr. Aris.  All it says is, I saw him on the floor

24  pointing somebody somewhere, I don't know what he was pointing

25  to, I don't know what was said, I don't know what products were

E9BKEBIM

1    even involved, and I don't know what was done with those

2    products.

3              THE COURT:  Well, this is all in the context of

4    allegations that he is the current president and chief

5    executive officer of KFI, that he is actively involved in the

6    business, that he determines which suppliers KFI purchases

7    from, that he determines which products KFI will accept from

8    suppliers, that he works every day, that he has authority over

9    the actions of the employees, that his office is on the

10   production floor, that he would look at what was being packed,

11   that he was, for a period of time in effect the production

12   manager, that he was there from early morning until

13   mid-afternoon.  And then there is testimony like -- this page

14   21 of the complaint -- question:

15   "Q.  Who was it that decided to put pomace oil in that tin and

16   sell it as a hundred percent pure olive oil?

17   "A.  I don't know who that would be, but the one who did it

18   normally was Mr. Aris.

19   "Q.  Mr. Aris was responsible for what was in the tin?

20   "A.  Yes."

21             I'm just picking these out at random, virtually from

22   page after page.  So it's not simply the single item that you

23   made reference to.

24             MR. JURELLER:  Right, your Honor, it's relying on one

25   individual, Ms. Maria Annetti, who was there for eight months

E9BKEBIM

1     and apparently was --

2               THE COURT:  Please tell me where the law in the United

3     States says that a complaint can't be brought on the basis of

4     the eyewitness testimony of a single individual.

5               MR. JURELLER:  I'm not saying that.  Let me continue

6     on what I meant.  What I tried to look at is, taking this all

7     as a whole here, taking what is in the complaint, you know, we

8     have to take it as being true just by the fact discovery has

9     been done.  What do we have?  We have nondescript -- leading

10    questions but nondescript answers as to someone doing

11    something.  We don't know when, where, what, how or -- it's,

12    yes, well, I don't know who does it but I think he was one of

13    the guys who did it, I don't know -- I think he was on --

14              THE COURT:  Well, if this were a summary judgment

15    motion or if you were to bring a summary judgment motion

16    separate from a motion to dismiss, is it your contention that

17    they have not supplied the details and answered the problems

18    you're now raising and therefore you would be entitled to

19    summary judgment, or is it your contention that they have

20    answered those but they didn't put it in their complaint and

21    therefore the complaint should be dismissed?

22              MR. JURELLER:  Well, I think the question is both,

23    your Honor, and I'll tell you why.  With respect to this --

24              THE COURT:  Well, because I have the total untrammeled

25    discretion to convert this into a motion for summary judgment.

E9BKEBIM

1          MR. JURELLER:  What I am saying is, the complaint

2     doesn't meet the burdens necessary to prove these four causes

3     of action on behalf, that this individual -- and we're talking

4     about Mr. Aris at this point -- this individual made

5     misstatements that met GBL 349, met the New Jersey Consumer

6     Fraud Act, met the fraud pleadings or the negligent

7     misrepresentations.  What they pled in there doesn't meet that.

8          On a summary judgment standpoint, clearly this doesn't

9     meet that, in my opinion, because, again --

10          THE COURT:  I understand that.  My question is

11     slightly different.  Let's just make it clear, because what you

12     are arguing in effect is, they had the benefit of virtually all

13     discovery.  So there was no excuse for their not putting it in

14     the complaint everything that would be adequate to legally

15     support their complaint against that motion to dismiss.

16          So, for example, this would not be a situation where I

17     would give leave to replead as you might have in a motion

18     brought before discovery, but the question I'm asking is:

19     Assuming, for the sake of argument, I were to convert this into

20     a summary judgment motion, at least this portion, in which case

21     I'd give each side a chance to add some facts, if they had any

22     facts that went beyond the complaint, are you saying that there

23     are no facts out there, as far as you're aware, that would

24     answer the problems you are now raising?

25          MR. JURELLER:  I believe the answer to that is, yes,

E9BKEBIM

1     your Honor.  And I believe the fact that it wasn't put into the

2     complaint in the first place is a reason --

3          THE COURT:  All right.  So why should we have this

4     somewhat abstruse debate over whether this fairly detailed

5     complaint is nevertheless insufficient?  It's not like you're

6     arguing some glaring oversight, like they failed to allege, if

7     it were a diversity case, damages of 75,000 or separate

8     citizenship, it's not that kind of argument.  It's an argument

9     about for nitty-gritty details.  Why shouldn't we just convert

10    it, that portion of the motion, into a summary judgment?  If

11    there's anything further they have for discovery, they can

12    present it quite quickly.  If there's anything further that you

13    want to present for discovery, you can present it quite quickly

14    and then I can decide a summary judgment.

15          Doesn't that make more sense?

16          MR. JURELLER:  As a defendant, we're ready to move

17    forward as quickly as we can.  So we will certainly be open to

18    that, your Honor.

19          THE COURT:  I'll hear from the plaintiff.

20          MR. JURELLER:  We do feel the plaintiff doesn't meet

21    the --

22          THE COURT:  I understand that, but I'm looking at it

23    as a practical matter.

24          MR. JURELLER:  So putting the facts aside, they're

25    purported facts, as they're put in here, I don't know if you

E9BKEBIM

1    want to get into the same argument with respect to the

2    allegation against Themis, but it's a similar to same

3    thing that --

4            THE COURT:  See, you had two types of arguments.  For

5    example, on the first counts, the first two counts, your

6    argument is that the statutes, New York and New Jersey

7    statutes, on their face do not cover individual liability in

8    this situation because, for example, Section 2-313 of

9    New Jersey's Uniform Commercial Code, which is the section that

10   underlies Count Two, says "(1) Express warranties by the seller

11   are created as follows:  (a) any affirmation of fact or promise

12   made by the seller to the buyer which relates to the goods,"

13   et cetera, et cetera.  And "seller" in that context, as applied

14   to the facts here, can only mean the company and, therefore, no

15   individual liability under that circumstance for these

16   individual defendants.

17           MR. JURELLER:  That's correct.

18           THE COURT:  That's very different from the argument

19   you're now making with respect to the other counts, which is,

20   they haven't put in enough detail to plead certain --

21           MR. JURELLER:  I think there are two parts to it, your

22   Honor, and I took it the opposite way you took it.  Yes, from a

23   standpoint of the statute itself -- and it was just the way my

24   notes were organized.

25           THE COURT:  So what I want to know with respect to

1    Counts Three, Four, Five and Six -- is there anything you

2    wanted to offer as a purely legal argument, as opposed to an

3    insufficiency of the factual allegation type argument with

4    respect to those counts?

5          MR. JURELLER:  Right, let me -- you hit the first one

6    and we've already put in our papers, and let me start with the

7    GBL 349 just because going in order.  It requires a

8    misrepresentation by the seller.  KFI was clearly the seller

9    here, there's no plausible allegation that Themis or Mr. Aris

10   were the seller, any actions that were done were in their

11   positions as officers or directors of the company.  So they are

12   not the seller, and therefore we don't get that far.

13          In addition, with GBL 349, the cases that are cited by

14   plaintiffs are clearly distinguishable.  What they indicate,

15   when you're going to hold an officer liable, is almost a

16   specific -- specific either individual holding themselves out

17   as liable, which is in the case of the Board of Managers of

18   Mark Gardens Corp. where he individually signed the

19   certification, or with respect to the Abrams case versus 21st

20   Century Leisure Spa, where the officer actually violated the

21   law himself, and that was a violation of they found a violation

22   of executive law 63(12), I think it was.

23          So with respect to the GBL cause of action, we believe

24   that, number one, they're not the seller; they can't become

25   liable.  Putting aside the fact that we don't think there are

E9BKEBIM

misrepresentations in the first place, even if necessary.  So,

therefore, that one, we believe, should be knocked out.

        With respect to the New Jersey Common Fraud Act, the

case law that we have found indicates that individual liability

under the CFA can only apply to a person who violates the CFA

by means of an affirmative misrepresentation and a knowing

omission, and they can only be liable for their own acts.

Again, we don't believe what the plaintiffs pled meets that

pleading requirement, and, therefore, doesn't go that far, to

the officers and directors.

        In addition, what the cases say is that individual

cannot be liable under the CFA merely because of the act of the

corporate entity.  And, again, the seller in this circumstance

is KFI.  Assuming they did something wrong or not, but KFI is

the seller, the seller is the party who is responsible here.

        In instances where an officer/director is liable now,

in every case that's been cited and every case that's been

brought, the cases against the corporation and the officer,

there's never been a case against one or the other, and it

makes sense because, clearly, you're finding the company liable

piercing the veil as well as the individual.

        In the Allen case, what it found was that they found

the individual officer liable because there were violations,

again, similar to the GBL violations of specific New Jersey

law.  And in our case, there's no allegations that not only did

E9BKEBIM

 1    the corporation violate any specific New Jersey law but no

 2    allegations that these two individuals violated any law, they

 3    made no representations on their own, they made no

 4    representations, all acts were done through the corporate

 5    capacity.

 6            So, based upon that, we believe that individual

 7    liability does not attach to the officers or directors, again,

 8    putting aside our arguments regarding the adequacy of the

 9    pleadings on the factual issues.

10            With respect to -- and, your Honor, I'm going to move

11    forward unless you want to stop at something.

12            THE COURT:  Go ahead.

13            MR. JURELLER:  With respect to negligent

14    misrepresentation claims, again, sticking to the legal aspects

15    of this, under New York law -- and we argued under the New York

16    law and New Jersey law just because that's where the claims are

17    being brought, in both locations -- under New York law, it

18    requires a special relationship between the buyer and the

19    seller in order to find a negligent misrepresentation.  And

20    what we cited in furtherance of that proposition is the Suez

21    Equity Investment L.P. case, which specifically indicates that

22    that special relationship must exist between the parties.

23            Further, further to that, the New York Court of

24    Appeals has stated that a simple commercial contract

25    relationship such as between a buyer and seller does not

E9BKEBIM

constitute a special relationship necessary to support a

negligent misrepresentation claim.

So under New York law, you need a special relationship

and a commercial, simple commercial relationship, such as we

have here, is not sufficient to get to that point.  And that's

putting aside the fact that it's between a seller and the

buyer, there's no plausible allegation or ability to plead an

allegation that the officer/director were the sellers in these

instances here.

Under New Jersey law, to the extent it applies -- and

I know plaintiffs have indicated they don't believe it applies

but just to make everything complete here -- it's similar.  You

need to have an independent duty under a specific New Jersey

statute in order to create negligent misrepresentation.  There

is nothing pled in the complaint that meets that pleading

requirement.

And lastly -- hold on a second.

When the Court is looking at this, through the motion

papers and opposition that have been submitted, the cases with

respect to negligent misrepresentations cited by the plaintiffs

are completely distinguishable.  One case relates solely to

jurisdiction rather than to liability.  The other relates to

prediscovery allegations, which we're beyond that here at this

point, clearly.

Getting to the last claim for fraud, fraud, as we

E9BKEBIM

know, under Twombly and Iqbal, you need to plead that with

particularity, you need to show statements, everything that you

and I talked about earlier when we were talking about the

details and the facts.  We do not believe that these claims

reach those heightened pleading requirements, based upon the

way that they are pled now.  They don't say the who, what,

when, where, although plaintiffs' counsel indicated who, what,

where, they looked at it from the wrong perspective, in our

mind.

In order to find the allegation -- remember, this is

not KFI, this is not the company, and it keeps getting confused

on the plaintiffs' side.  This is not the company, this is the

officers, directors, members.  You need to find them liable,

you need to find them, that they had the misrepresentations,

omissions, made those statements, who, what, when, goes to

them, when they did it, where they did it, how they did it.

And we don't believe that the complaint as pled meets the

heightened pleading requirements as against the individuals.

And that relates to all four of those.

THE COURT:  OK.

MR. JURELLER:  Our last argument we put aside, but our

argument was, your Honor, with respect to the fact that

plaintiffs have now filed their proof of claim in bankruptcy

court, and we talked about that earlier in the case so I'm not

going to get into that yet unless your Honor so chooses but --

E9BKEBIM

1             THE COURT:  No, I am aware of that argument.

2             MR. JURELLER:  I will sit for the moment unless you

3    have some questions.

4             THE COURT:  No.  Thank you very much.  Let me hear

5    from plaintiffs' counsel.

6             MR. BURSOR:  Your Honor, the six counts, they're the

7    same six counts that your Honor found were sufficiently pleaded

8    against the company.  And so the --

9             THE COURT:  Yes, but the point now is, assuming for

10   the sake of argument, that your alter ego claims are out -- it

11   doesn't matter whether they're in or out now; we're talking

12   about individual claims.  So the question before me is whether

13   on these claims, whether these individual defendants or any of

14   them took acts that personally directly violated those six

15   provisions.

16            MR. BURSOR:  Well, I think before you get to that

17   inquiry, the alter ego analysis is sort of the threshold issue,

18   because the point that I was going to start with is, all of

19   these six claims have been adequately pleaded against KFI in

20   the complaint that includes a subset of the allegations in this

21   complaint.  And this complaint alleges a veil-piercing/alter

22   ego theory of liability against the individuals.

23            So if the veil-piercing/alter ego theory of liability

24   survives, after looking at the Levesque case and the Hart case

25   probably taking a look at the Morris case, if they're --

E9BKEBIM

1          THE COURT:  Yes, then it becomes an easy question.

2     But now take it the other way.  Assuming it doesn't survive, do

3     any of these claims go through?

4          MR. BURSOR:  And the other issue that I want to make

5     on the veil-piercing is that the motion to dismiss did not

6     challenge the adequacy of the veil-piercing allegations at all.

7     The only argument the defendants raised with respect to the

8     veil-piercing allegations in the motion to dismiss is that

9     Judge Grossman had stayed the veil-piercing claims.  And I

10    think this Court has --

11         THE COURT:  No, no, no, and they certainly raised the

12    argument that it wasn't available independent of what Judge

13    Grossman had said, because it would be covered by the

14    bankruptcy stay, et cetera.  And there were a bunch of

15    arguments; there wasn't only the Judge Grossman argument.

16         MR. BURSOR:  But, for example, there was no --

17         THE COURT:  So let me ask you on that, because your

18    adversary said here in this court today, that you had not

19    adequately pled alter ego and veil-piercing, and are you saying

20    that's not raised in their papers?

21         MR. BURSOR:  I'm not saying that's not raised in the

22    papers.  If your Honor wants me to address it now, I'm happy to

23    address it.

24         THE COURT:  Well, I'm going to ask your adversary in a

25    minute to tell me where it's raised in their papers because, I

E9BKEBIM

1    agree, if it's not raised in their papers, it's too late to

2    raise it in oral argument.  If he shows me where it is raised

3    in their papers, then I'll come back to you for a response, but

4    let's go on.

5             MR. BURSOR:  Fair enough.

6             So if the alter ego part gets dropped out, which

7    hopefully it will not, from my perspective --

8             THE COURT:  And you're right, if the alter ego is in,

9    the individual liability, there's no issue there, it's in a

10   rough way the functional equivalent of an aiding and abetting

11   type theory.  But let's now assume that the alter ego is out.

12            MR. BURSOR:  OK.  Your Honor, to the extent this is a

13   motion to dismiss, and the argument is, the individuals can't

14   be liable on Counts One or Two or for whatever count because

15   they're not the sellers, because the company is the seller,

16   therefore, if you don't have the alter ego, these individuals

17   aren't the seller; your Honor, the complaint alleges that each

18   of the defendants is the seller --

19            THE COURT:  How can that be?  Let's assume for the

20   moment that this were summary judgment.  No one, as far as I

21   know, there's no evidence that any of the Kangadises went out

22   to the street corner and said, please buy my olive oil when it

23   was really pomace.  It was all sold through the corporation

24   that is in bankruptcy.

25            MR. BURSOR:  Your Honor, that's correct.  If the

E9BKEBIM

1    standard is, did one of these people personally go out on the

2    street corner and sell the olive oil, if that's the standard,

3    then --

4             THE COURT:  Why isn't that the standard except from a

5    veil-piercing/alter ego point of view?

6             MR. BURSOR:  Well, the reason it's not is because to

7    the extent -- we've pled facts that establish the complete

8    domination of the company by --

9             THE COURT:  That's a variation on alter ego or

10   veil-piercing.

11            MR. BURSOR:  Now that the legal argument is being made

12   that the veil-piercing theory of liability is unavailable for

13   legal reasons relating to the absence of the corporation, but

14   the same facts that show complete domination of the corporation

15   show that these individuals were responsible for what was

16   written on the tin, they were responsible for what was put into

17   the tin, they were responsible for how that oil got in the tin

18   and they were responsible for how that oil was sold in that

19   tin.

20            So whether there's some technical legal argument that

21   you can't have veil-piercing because of this bankruptcy for

22   some reason, the facts -- and there's a lot of facts in this

23   complaint --

24            THE COURT:  Yes, OK, that's an interesting argument,

25   and I think there's some plausibility to it.  You're saying

1     that even if, for some technical reason, you can't bring in

2     this action a claim against the corporation, namely, that it's

3     in bankruptcy, that doesn't mean that you can't show that the

4     individuals, through the device of this corporation or through

5     the front of this corporation or through the intermediary

6     actions of this corporation, were making misrepresentations to

7     the public and, if you're right on that, again, that would

8     cover all counts, including even Counts One and Two?

9              MR. BURSOR:  And, your Honor, in our papers, both in

10    our motion to dismiss opposition and in our class cert papers,

11    we cited for each count examples of cases under New York and

12    New Jersey law where the same cause of action was brought not

13    only against the corporation but against an insider, an

14    employee at the same time.  So I think that we've made -- to

15    the extent it's a legal argument, that you can't have a breach

16    of warranty claim, for example, against an insider because the

17    only warranting party is the corporation, I think we've refuted

18    that with the citation -- for example, with respect to Counts

19    One and Two, we cited the FlagHouse case --

20             THE COURT:  OK, I get the idea.

21             So let me go back to your adversary just for a moment

22    for two points.  First, where in your papers, if anywhere, do

23    you claim that they have not pled the elements of alter ego or

24    veil-piercing liability as opposed to that they don't have a

25    legal right to rely on that doctrine?

E9BKEBIM

1          MR. JURELLER:  Right, putting aside the whole legal

2     part of that doctrine, first, we were relying upon Judge

3     Grossman's decision, but we did, in our reply paper, in

4     footnote number 5, indicate that, "Further although plaintiffs

5     state that KFI was a sham, there are no plausible facts even

6     asserted on this point as Capatriti was one of only many

7     products admittedly sold by KFI."  That's the extent we got

8     into --

9          THE COURT:  Yes, that's not sufficient to raise it.

10          MR. JURELLER:  But it was also raised in their

11     opposition papers.  And as I believe we have a right to bring

12     it up at this hearing today.  As to the actual sufficiency of

13     the pleadings, we did indicate it's not a sham, there's no

14     proof that it's a sham, it's not plausible that it's a sham.

15     And all of the things that are asserted in there go to that

16     point.

17          The sham is --

18          THE COURT:  I'm doubtful you've raised it, to be

19     frank, but I will look at your briefs again.

20          MR. JURELLER:  If you look at footnote 5 --

21          THE COURT:  Look, as doubtless you will recall, from a

22     long line of Second Circuit decisions, mostly emanating from

23     Judge Friendly, generally regarded as the greatest judge that

24     served in this court in the 1950s and '60s, that say putting

25     something in a footnote is not something to preserve it for

E9BKEBIM

1    purposes, in that case, of appeal, but the same would be

2    applicable for a motion to dismiss.

3          However, I will look at all that, including the

4    footnote 5, in what appears to be extremely small but legible

5    type.

6          MR. JURELLER:  And I apologize for that, your Honor.

7          THE COURT:  But I'm going to interrupt and I will come

8    back to you in a second.

9          MR. JURELLER:  Oh.

10         THE COURT:  Let me hear, assuming arguendo that the

11   matter has been raised, although I am skeptical it has been,

12   assuming arguendo, what would you respond?

13         MR. BURSOR:  Your Honor, assuming arguendo it's been

14   raised, what I would say is that the facts, the specific facts

15   that we pled to support piercing the veil are that:  Themis

16   Kangadis submitted a false affidavit to this Court in April of

17   2013 -- I think it was April 2013 -- in a NOA action stating

18   that he was the president of the company.  He then testified he

19   was not president of the company when I took his deposition,

20   that's in the complaint.  He testified he has no title.  That

21   Mr. Aris Kangadis, who was represented to this Court to be

22   retired since 2005 and to have no role when they were trying to

23   stop us from getting his deposition, in fact, he was the chief

24   executive officer in the present company.  His son posed as

25   chief executive officer of the present company in a way that,

E9BKEBIM

1   in our view, was perjurious.  We've alleged the absence of any

2   corporate formalities -- no shareholder meetings, no minutes,

3   no shareholder votes.  And that's based on the admissions of

4   Aristidis Kangadis and Themis Kangadis, where they testify

5   along the lines of, this is not General Motors, it's a family

6   business, that's why we don't have shareholder meetings, never

7   a vote, never a meeting, never a minute, somebody posing as the

8   president who's not the president, somebody swearing under oath

9   as president, diversion of resources.

10          They've got the CFO of the company, Dennis DeTore, on

11   company time doing work for the other entities owned by the

12   individuals.  That's based on Mr. DeTore's testimony.  They've

13   got Themis Kangadis taking distributions from the company --

14   well, we don't know if they were distributions -- taking money

15   from the company on 20 or more occasions, according to the CFO,

16   Mr. DeTore.  And according to Mr. Themis Kangadis himself, when

17   asked, were these distributions, he says, I don't know; when

18   asked, were they loans, he says, I don't know; when asked, what

19   were they, his lawyer instructs him not to answer.

20          So we've shown a complete --

21          THE COURT:  Is that right, by the way?  On what ground

22   did the lawyer instruct him not to answer?

23          MR. BURSOR:  Relevance.

24          THE COURT:  This was not brought to my attention.

25          MR. BURSOR:  I wish I had brought it to your

E9BKEBIM

1    attention.  It was not brought to your attention.

2              THE COURT:  Who was his lawyer?

3              MR. BURSOR:  Mr. Arth, the partner from Fox

4    Rothschild, the prior counsel.

5              THE COURT:  Well, they're not before me now, but if

6    the facts are as you just said, of course that would be not in

7    compliance with the Federal Rules, and you cannot direct a

8    witness not to answer on the grounds of relevance.

9              MR. BURSOR:  Your Honor gave us in a good lesson in

10   that a couple days after this happened, and so...

11             THE COURT:  Anyway, it wasn't raised.  But the

12   relevant point is what he said about not knowing whether there

13   were distributions, not knowing whether they were loans.

14             MR. BURSOR:  Right.  And we don't know what the

15   amounts are.

16             And, your Honor, the other veil-piercing argument that

17   goes straight to the heart of whether this is a real

18   corporation or a sham, as we've alleged, is you have the

19   testimony of a witness who was the director of quality

20   assurance, supposedly the director of quality assurance at the

21   company, who is testifying on several instances that she wanted

22   to initiate recalls when she found out about the presence of

23   the pomace and she's being overruled by a shareholder who has

24   no formal title at the company, according to his own testimony,

25   Themis Kangadis, no title at the company, is not the president,

E9BKEBIM

1   is overruling the corporation's director of quality assurance

2   and saying we cannot have a recall and, even before overruling

3   her, is taking acts to conceal the presence of the pomace from

4   her.

5           So it's not a traditional veil-piercing type

6   allegation, because it's more specific to this case, but it's

7   an allegation that shows the complete domination with respect

8   to the acts at issue here because the person who supposedly was

9   the employee of the corporation responsible for this area is

10  being completely overruled by a shareholder, who has no title.

11          So we think that's more than sufficient to meet any

12  standard for piercing the corporate veil.

13          THE COURT:  All right.  Let me go back to defense

14  counsel.

15          MR. JURELLER:  Your Honor, would you like me to

16  address that?

17          THE COURT:  Well --

18          MR. JURELLER:  This is a closely-held company, run

19  by -- owned by father, mother and son.  There's nothing in here

20  that I see for some sort of perjury that has been alleged that

21  someone said something.  It's a family company that's run as a

22  family company.

23          Like most closely-held companies, it doesn't have all

24  the shareholder meetings because it's three people, the father,

25  the mother and the son.

E9BKEBIM

1      There's no allegation with respect to the transfers

2  that those transfers were in violation of any law, that they

3  were not complying with any law.  All it says is that there

4  were transfers going to a shareholder who also runs the

5  company.  Whether his title is president, whether his title is

6  CEO, the fact of the matter is, it's a family company, run by

7  the son.

8      So we'll get into little details.  Every small

9  family-run business throughout the State of New York, and

10  probably elsewhere, would fall into this, but there's nothing

11  in here that shows any wrongdoing whatsoever or that it was

12  used as a sham.  This company was used for many other purposes.

13  It had lots of products, it sold products, and there's nothing

14  wrong evidenced by what was alleged here at all, I mean at all.

15      THE COURT:  Let me ask you the other question that I

16  wanted to ask you before.  What do you say to their argument

17  that even if, because of the bankruptcy, obviously, the

18  corporation can't be held liable, and even assuming that the

19  liability of the corporation, as a legal matter, cannot be the

20  subject of claims made, on an alter ego basis or veil-piercing

21  basis, against the individuals because of legal impediments

22  under New York law or bankruptcy law, whatever, assuming all

23  that, they say nevertheless that doesn't mean that you can't

24  bring an action against an individual to show that he

25  intentionally caused a fraud to be perpetrated using as his

E9BKEBIM

vehicle a corporate veil, that those claims may or may not be

proveable, but assuming they have been properly alleged, if you

can show that Joe Smith decided to defraud a group of customers

and in order to undertake that fraud he caused a company that

he controlled as a factual matter to make the

misrepresentations that he wanted made, why is that precluded?

          MR. JURELLER:  Well, your Honor, I think the

assumptions are extremely big assumptions.  You're basically

saying if we disregard the corporation, under New York law and

the protections that you have, if we then disregard the law on

piercing the veil, which requires you to get -- it presupposes

the corporation being liable, if you disregard the entire

bankruptcy court and the fact that you have all those rights to

go after the individual in bankruptcy, it's there --

          THE COURT:  Their argument, you're saying, renders

those provisions, assuming you're right --

          MR. JURELLER:  You are throwing them out.

          THE COURT:  -- a nullity?  I do think that's the

problem.  They say there are cases where it's been allowed.

          MR. JURELLER:  But, again, the fourth step, in order

to get to this, you now need to pass that fourth step also.

You need to now show that that liability reaches that officer,

director, principal, member, under the particular statutes in

question, the GBL 349, the New Jersey Consumer Fraud Act, the

fraud and negligent misrepresentations under the heightened

E9BKEBIM

1    pleading standards, you need to get that point.  You can't just

2    say, oh, they filed bankruptcy, we think it's a fraud, so we're

3    just going to disregard all of the law and we're going to hold

4    you liable for the corporate acts because these are all

5    corporate acts.

6            Everything was sold under KFI, everything was

7    marketed, everything was done under KFI, all of the acts that

8    were alleged here were done through KFI.  And it would be a

9    complete disregard --

10           THE COURT:  Well, what I am unclear on -- and I have

11   to go back to the briefs on this, I don't have a memory on

12   this -- I thought I heard plaintiff saying -- and maybe I'll

13   put this question to plaintiffs' counsel first -- are there

14   cases under New York or New Jersey law or both, under these

15   particular sections, where individuals have been held liable

16   for violations of those sections -- I'm talking about Counts

17   One and Two -- even though the seller in the direct sense was

18   their company?

19           MR. BURSOR:  I'm sorry, the last part?

20           THE COURT:  In other words, are there cases, under

21   either of those laws, where company X made a misrepresentation

22   to consumer Y, and not just the company but the individual or

23   just the individual was held liable?  This has nothing to do

24   with bankruptcy and has nothing to do with any of the other

25   doctrines we have been discussing.  I just want to know if

E9BKEBIM

1    there are cases under the law.

2                MR. BURSOR:  The answer is, there are cases under

3    New York and New Jersey law that have certainly let claims like

4    those pass the motion-to-dismiss stage, and I think some of

5    them even pass the summary judgment stage.

6                THE COURT:  Despite an argument that individuals are

7    not covered?

8                MR. BURSOR:  Yes.  And with respect --

9                THE COURT:  So let's put this to the test.  Give me

10   what you would consider maybe the two best cases.

11               MR. BURSOR:  Well, I don't know which ones are the

12   best, but with respect to the warranty claims under New Jersey

13   law, we cite the FlagHouse case at page --

14               THE COURT:  Let's pull that up.

15               THE LAW CLERK:  It's 528 --

16               THE COURT:  See if you can print that out while we

17   continue.

18               MR. BURSOR:  And with respect to the GBL claim, GBL

19   349, we cited the Board of Managers of Mark Garden Condo.  It's

20   2008, WL 4058677.

21               THE COURT:  OK.  We're going to pull up those two

22   cases.  Because we've gone two hours and I have a lunch I have

23   to go to at 1:00 o'clock -- it's now 12:30 -- I want to shift

24   to something totally different while we pull up those two cases

25   and we're going to come back --

E9BKEBIM

1          MR. BURSOR:  Your Honor, just on the GBL one,

2    actually, the better case is the second one we cite, it's

3    People by Abrams because it actually has a finding of

4    liability.

5          THE COURT:  OK, we will pull up that one too.  What's

6    the cite on that?

7          MR. BURSOR:  It's 583 N.Y.S.2d 726.  And that's a case

8    where the there was a judgment entered into government

9    enforcement action.

10         THE COURT:  We'll take a look at it.  So I am going to

11   put the argument on both sides on hold while we get to those

12   cases and shift to something totally different, which is class

13   certification.

14         Assuming the case survives in whole or in part, you've

15   already briefed the class certification, I will need to decide

16   that then as well, and there's only one point, because now we

17   are running out of time, that I wanted argument on.  This

18   arises from a decision that Judge Koeltl made where he in a

19   case denied class certification because the law of fraud varies

20   so much from state to state.

21         I'm not totally sure I agree with that, but even if

22   that were so, wouldn't that argue, at most, for limiting the

23   class maybe to New Jersey and New York, not to denying

24   certification altogether?  Because certainly both parties have

25   briefed at great length what New York and New Jersey law is,

E9BKEBIM

and I have a very good feel for it as a result and know whether they were sufficiently similar or dissimilar as to warrant class certification.

So let me hear, I guess, first from defense counsel opposing class certification and then from plaintiffs' counsel.

MR. JURELLER:  Well, your Honor, just to clarify what you're asking --

THE COURT:  I'm asking, if the case is not dismissed in its entirety, so I have to reach then the question of class certification, with respect to the argument that the class certification should be denied because the law of fraud varies -- and all these counts sound in effect like fraud in one sense or another -- tremendously from state to state and therefore a nationwide class would be inappropriate, doesn't that at most argue that I should limit the class to New Jersey and New York, not that I should eliminate the class altogether? That's the question, the narrow question, that I wanted to address.  There are a hundred other questions under class certification you both briefed, but we're not going to argue them today.

MR. JURELLER:  Well, your Honor, I hope you never get to that point.

THE COURT:  I understand.

MR. JURELLER:  But if you were to limit it to New York and New Jersey, clearly that affects the commonality of the

E9BKEBIM

1    argument.  However, I think a couple things:  You're now

2    bringing class actions in two states when we have sales that

3    the plaintiffs have shown are in 50 states, and how that

4    affects parties --

5           THE COURT:  One of the reasons I'm raising this is

6    because it's not clear to me that you would want -- if the

7    choice were a class action where the class was New York and

8    New Jersey or a class action where the class was nationwide,

9    it's not clear to me -- this is your decision, not mine --

10   whether you would prefer a class action limited to two states,

11   given your nationwide sales.  You might prefer to have this

12   resolved across the board one way or the other.

13          MR. JURELLER:  Well, as I said, I think it clearly

14   changes the arguments.  Obviously, we don't have that issue

15   with respect to the fact that there's -- there was 50 states'

16   fraud laws that we had to deal with.

17          I think the only answer to that is, even if you were

18   to look to both states -- so if you were to look at the

19   reports, it appears that the majority of sales were in

20   New York, New Jersey and that particular area -- however, there

21   were substantial sales outside of New York and New Jersey --

22   you still have -- even if you were to limit it just to the

23   fraud statute of those two particular states, all of the other

24   problems, concerns that you had raised in your prior

25   certification are still there, all of them, because you have in

E9BKEBIM

1     New York, where the majority of the sales are, you still have

2     the significant, significant -- and impossible, in our

3     opinion -- ascertainability issue in New York.  So I don't

4     think it takes away your burden of having to look at those

5     other issues and decide those other points because of the

6     nature of the sale.

7               So the plaintiffs were able to identify --

8               THE COURT:  So I understand that argument as to why it

9     should not be a more limited class of New Jersey and New York.

10    However -- and you don't have to give me an answer on this

11    today if you want to consult with your client -- in the

12    hypothetical possibility that you had to choose between a class

13    limited to New York and New Jersey or a nationwide class -- I

14    may not come out on that at all, I may agree with you that

15    there should not be any class, I may not even get to class

16    action, there are many, many hypothetical possibilities, but I

17    want to get everything decided in the next few days.  So what I

18    need to know from you and your client is, in that possibility

19    that the choice is between a nationwide class and a class

20    limited to New York and New Jersey, which would you prefer?

21    You don't have to --

22              MR. JURELLER:  It's like dropping a rock on one foot

23    versus the other.

24              THE COURT:  I understand.  But I can see reasons why,

25    if you were put to that Hobson's choice, you might prefer one

E9BKEBIM

1      or you might prefer the other.  So you can let me know, by

2      letter later today, which you would prefer.

3                MR. JURELLER:  The only thing I would say, your Honor,

4      is, that's a very difficult question because we believe, even

5      putting that part aside, we believe you don't get that far with

6      our other arguments --

7                THE COURT:  I may not get that far.  This is purely

8      because I am determined, for your sakes as well as mine, to get

9      these motions all determined very promptly.  So I don't want to

10     have to keep going back and say, well, now that I have reached

11     this point, what do you think?  I may never reach this point

12     but I would like to know the answer later today.

13                MR. JURELLER:  We will get that response to you.  If I

14     may ask, if I can get it to you tomorrow?  Because I have a

15     medical appointment unfortunately --

16                THE COURT:  Of course, tomorrow is fine.  By 5:00 p.m.

17                MR. JURELLER:  I say that because I don't want to

18     ignore -- we think that the rest of the arguments are actually

19     stronger than that one.

20                THE COURT:  You've fully preserved it.

21                MR. JURELLER:  Thank you very much.

22                THE COURT:  Go ahead.

23                MR. BURSOR:  So the answer to your Honor's question

24     was, yes, if you find a 50-state problem, it's not grounds for

25     denying cert, it's grounds for certifying the narrow geographic

E9BKEBIM

1    class, but I don't think that's what should happen here.

2              THE COURT:  For you, it's easy; you'd rather have half

3    a loaf than no loaf but you prefer the whole loaf.

4              MR. BURSOR:  So courts have taken two approaches to

5    this choice-of-law issue with class cert.  There's one -- and

6    this wasn't really briefed, so we didn't put these authorities

7    in, but I can tell you I've briefed them many times.  One train

8    of thought is -- and you see this in many decisions -- 50

9    states, that you can't possibly be certified because of the

10   differences, with no real analysis in the decision.

11             The other and better way to approach it at class cert

12   is to go through a choice-of-law analysis to determine whether

13   there would be any requirement to apply the laws from outside

14   the forum state.  That's an analysis your Honor did in the KFI

15   action and concluded that New York law applies.  And,

16   generally, at class certification courts that do the

17   choice-of-law analysis impose the burden to establish that a

18   foreign jurisdiction's law should apply on the party asserting

19   that the foreign jurisdiction --

20             THE COURT:  I must say that is the way I have gone in

21   some prior cases.  Judge Koeltl is a very excellent judge and

22   his opinion gave me a little pause.  I agree with you this was

23   not really briefed, but I have familiarity with the arguments,

24   so I will take it under advisement.

25             Let's go back.  I now have those three cases.  So now

E9BKEBIM

1    tell me again what you thought was the best of all.

2            MR. BURSOR:  Well, on the GBL, it was the one, People

3    of New York through Mr. Abrams, I think, was --

4            THE COURT:  Yes, right.  Let me just look at that.

5    This is a decision of the lower court, Supreme Court of

6    New York, which, to the endless confusion of all law students,

7    is actually the trial court of New York despite its name, and

8    let me see where it is.

9            MR. BURSOR:  And, your Honor, I don't have a copy with

10   me, but I'm looking at what we said in our brief.  And it says

11   that a petition was granted, petition for judgment and

12   government enforcement action under GBL 349, against both an

13   individual defendant who was the president of the company and

14   against the company itself.  And we cited that in support of

15   the assertion that New York courts permit claims for violation

16   of 349 to proceed against both the employee and the --

17           THE COURT:  I'm reading just the squib -- I have to

18   read this more carefully -- but the squib says, "State-brought

19   action against health club and its manager alleging fraud after

20   a health club unexpectedly closed.  The Supreme Court of

21   New York County, Greenfield, J., held that:  (1) manager could

22   be held personally responsible for club members' losses despite

23   even absent intent to defraud; and (2) club manager could be

24   enjoined from engaging in any illegal or fraudulent acts or

25   from entering into any contracts or renewing existing

E9BKEBIM

1     contracts."

2          The latter holding seems to me to be irrelevant.

3     Injunction of the law can go much broader than what liability

4     might attach, but the first holding -- and indeed it was a

5     holding -- to pay restitutions to the members of this health

6     club, the respondents did not deny any of petitioner's

7     allegation.  Their claim was that it was the individual's

8     fault, their now former manager at the point in time where this

9     occurred.

10         But he argued -- his name was Verderama -- that he

11    cannot be held personally liable because he did not personally

12    benefit from the alleged fraud.  That's a different kind of

13    argument.

14         And then there was an argument about the merits of

15    whether there was any fraud.

16         None of them look to me like the court addressed the

17    issue we're talking about here.  I know you don't have it in

18    front of you.  It is true that a judgment was entered but it

19    doesn't appear that the issue was raised.  So he didn't raise

20    the issue, the court had no reason to address it.

21         MR. BURSOR:  Well, I thought the issue was, can

22    liability attach to an individual?

23         THE COURT:  Right, but he didn't raise that.  He, for

24    whatever reason, at the decision of his lawyer maybe, wittingly

25    or unwittingly, didn't raise that issue.  His contention was

E9BKEBIM

1    all about the facts that he personally didn't do anything

2    wrong.

3                    MR. BURSOR:  That's the same argument being made --

4                    THE COURT:  No, no, no, it's different.  He's saying

5    he wasn't liable, factually liable, that he didn't commit any

6    fraud, and the Court held, yes, you did.  I didn't read it all

7    into the record, but if you look at it, he recites all the

8    things he did and that in fact his contention, more

9    particularly, was that what he was doing was totally proper,

10   whatever the club may have done, and they say, no, no, no, he

11   did a lot of improper things.  That's from a quick reading of

12   it.

13                    But he never said, I can't, under the statute, be held

14   liable because it only applies to the corporation.  And if he

15   didn't raise the issue, I don't see how you can see this -- it

16   is, at best, very modest authority.

17                    MR. BURSOR:  I'm not sure, your Honor.  It depends on

18   what the question is.  If the question is, can an individual be

19   held liable under 349, certainly it's authority for that --

20                    THE COURT:  Well, if the issue is not raised before

21   the court, unless it's jurisdictional, the court has no

22   obligation to raise it sua sponte and arguably it should not

23   even be raised sua sponte.

24                    All right, we are running out of time.  I'm going to

25   conclude this by saying as follows:  I will get you a

E9BKEBIM

bottom-line ruling, with opinion to follow, at no later than

Wednesday of next week.  I hope to do actually better than

that, but Wednesday at 5:00 p.m. at the latest.

If for any reason I decide to convert any portion of

the motion into summary judgment, I will set a very quick

schedule and I will not require either side to put into 56.1

statements but, rather, simply to give any me additional facts

that they think bear on whether there is a genuine issue for

the jury under the particular claims that I will address.  I'm

not sure I'm going to go that route at all, but if I do go that

route, I will specify quite specifically what I want and what I

don't want if we have summary judgment so that we can put that

on a very quick schedule too.  It will be narrow.

Independent of that, I did ask defense counsel to tell

me today whether they intended to bring a summary judgment

motion and, if so, on what grounds.  So let me hear from

defense counsel.

MR. JURELLER:  Your Honor, obviously it depends on

what happens here with respect to these motions.

THE COURT:  Of course.

MR. JURELLER:  But as you and I discussed earlier in

the argument, back about an hour or so ago, we do believe we

have grounds for summary judgment.

THE COURT:  Yes.  Would it be on anything other than

the kinds of things we were discussing?

E9BKEBIM

1         MR. JURELLER:  It will be mostly on the things we

2    discussed because I think those are the pertinent issues.  If

3    piercing the veil is left, I think we still have summary

4    judgment on the piercing the veil.  If you get to direct

5    claims, if any of those are still out as to piercing the

6    veil -- excuse me, we have a summary judgment on those claims

7    too because the fact of the matter is, discovery is done and we

8    believe, if you're basing it on the pleadings and we need -- I

9    think we have those arguments there.  So we would like to move

10   for summary judgment.

11        THE COURT:  OK.  I think then, given that, I'm going

12   to change my mind about how I'm going to handle this.  I will

13   address this motion strictly as a motion to dismiss.  I will

14   decide it on that basis by next Wednesday.

15        And then I agree that that may still open the door,

16   depending on how I come out, to a summary judgment motion.  I

17   think this argument today shows that there will be a good-faith

18   basis for bringing a summary judgment.

19        MR. JURELLER:  Thank you, your Honor.

20        THE COURT:  And then your papers would be due on

21   September 30th.

22        MR. JURELLER:  Could I ask that it get moved either

23   one or two days from there?  The only reason is, I'm coming

24   back from a long-planned trip on that Monday, which is the

25   29th.  If I could even the 1st or the 2nd?

E9BKEBIM

1              THE COURT:  Yes.  But of course remember, the one day

2       that's not going to change is the trial, starting November the

3       3rd.  So in some ways you're hurting yourself by further delay

4       but --

5              MR. JURELLER:  One more day then would be fine.

6              THE COURT:  OK, that's fine.

7              MR. JURELLER:  Let me preface that:  If we're not

8       going to be able to get it done in time, we will have it in on

9       the 30th, but if -- one day is going to affect that, but if one

10      day is not going to affect the ultimate motion schedule, that's

11      fine.

12             THE COURT:  Well, I'm going to give them probably two

13      weeks to respond, so let's assume it's October 2nd.  So moving

14      papers on October 2nd, and reply papers, answering papers, on

15      October 16th.

16             Now, my strong suggestion to you is you put in

17      reply -- I don't need oral argument on this -- you put in reply

18      papers in less than a week.  I would normally give you a week,

19      but my suggestion is that you put in your reply papers, say, on

20      October 21st.

21             MR. JURELLER:  That's fine with us, your Honor.

22             THE COURT:  Pardon?

23             MR. JURELLER:  We're open to whatever the Court

24      suggests.

25             THE COURT:  OK.  Then I will decide that motion on

E9BKEBIM

1    October 24th.

2              MR. JURELLER:  With no oral argument, correct?

3              THE COURT:  No oral argument.

4              Now, in terms of -- the one thing I will change is, in

5    terms of the trial, I normally require motions in limine to be

6    exchanged between the parties two weeks before the trial and

7    then given to me one week before the trial, but instead, any

8    motions in limine -- which, by the way, are totally unnecessary

9    in most cases -- you can raise these orally at the time through

10   an objection when the evidence is first presented and sort it

11   out there.  My experience is, most motions in limine I resolve

12   by saying I can't resolve this until I hear the evidence in the

13   case, so it doesn't do much good.

14             But nevertheless, if there are motions in limine, the

15   moving papers don't have to be served until October 28th.  The

16   answering papers don't have to be served until October 31st.

17   No reply papers, and I will deal with them before we swear in

18   the jury on November 3rd, and I have flag for you in advance,

19   that the chances are overwhelmingly that I will deal with them

20   by saying we will deal with that as the evidence is presented.

21   So you will have wasted your time but, heck, what the hell.

22             First of all, as you are aware, there's actually no

23   provision in federal law that requires motions in limine or

24   even authorizes motions in limine; they are purely a

25   judge-created motion.

E9BKEBIM

```
 1              And second of all, the failure to file a motion in
 2     limine does not waive any right whatsoever.  So if the motion
 3     in limine, for example, is no one should refer to X, you can
 4     raise that even before opening argument and we will discuss it
 5     then or you can raise it with the first witness, just ask the
 6     question and you ask for a sidebar.  So motions in limine are
 7     usually a waste of time.
 8              Anything else we need to take up today?
 9              MR. BURSOR:  Your Honor, there are two things.  One
10     is, there was a case that came down from the Seventh Circuit on
11     class certification after our briefing.  I'd just like to
12     provide the Court with a citation to that.
13              THE COURT:  Sure.
14              MR. BURSOR:  It's Suchanek versus Sturm Foods, Inc.,
15     it's 2014 WL 4116493, it's Seventh Circuit August --
16              THE LAW CLERK:  Say that one more time.  Sorry.  The
17     Westlaw citation.
18              MR. BURSOR:  2014 WL 4116493.
19              THE LAW CLERK:  Thank you.
20              MR. BURSOR:  Seventh Circuit, August 22nd, and it
21     involved a GBL 349 claim on a mislabeled product.  So that
22     might be of interest to the Court.
23              The second --
24              THE COURT:  Who's the panel?  This is the Seventh
25     Circuit?
```

E9BKEBIM

1          MR. BURSOR:  Seventh.

2          THE COURT:  Yes, Seventh?  All judges are equal, of

3    course, but Judge Posner and Judge Easterbrook are

4    particularly --

5          MR. BURSOR:  They're more equal.

6          THE COURT:  Well, someone might claim that, right.

7          MR. BURSOR:  It was Chief Judge Wood and Judges --

8          THE COURT:  Diane Wood, very famous judge, OK.

9          MR. BURSOR:  And Judges Cudahy and Rovner were on

10   the --

11         THE COURT:  Very good.  Thank you.

12         MR. BURSOR:  The second issue we had was, we had a

13   discovery issue raised by letter and your Honor deferred it

14   till today's hearing.

15         THE COURT:  I forgot that.  Yes, remind me of what

16   that was.

17         MR. BURSOR:  Well, your Honor, there are claims in the

18   case -- we sought financial discovery from each of the

19   defendants.  And the reason is because there's a claim for

20   punitive damage in the case and New York law requires

21   consideration of the financial condition of the defendant as a

22   part of the punitive damages analysis.  So my concern is --

23         THE COURT:  Yes, that's a fair concern.  But you

24   should be aware that I always bifurcate -- I ask the jury in

25   their initial verdict whether they wish to have punitive

E9BKEBIM

damages, award punitive damages.  If the answer is no, we don't

have to reach this kind of issue.  If the issue is yes, then I

call the jury back to determine punitive damages but only after

they have been presented with the evidence bearing just on

punitive damages.

So I think that you would be at that point clearly

entitled to that discovery, but that we don't need to get into

that now.  I think the way to handle that is, I think we will

have, after I decide this motion and we get -- assuming the

case goes forward, we have a few days of testimony, it will be

much clearer to me, as well as to counsel, whether punitive

damages claim is even going to survive.  And if it is, then I

will arrange, maybe over a weekend or by papers, through

document production, to have that supplied to you before we

reach the end of the case, so that you will have that

information.  But I think it's appropriate to put it off till

then.

I put defendants on notice, therefore, that they may

have to get this information gathered even while they're in the

middle of trial, which is a burden.  If they would prefer to do

it now, of course, I can order it now, but I suspect they might

want to prefer to wait because it may become moot.

MR. JURELLER:  We will wait, your Honor.  Thank you.

THE COURT:  Very good.

MR. BURSOR:  Your Honor, can I ask you a question

E9BKEBIM

1    about that?  My only question was, does your Honor excuse the

2    jury for some period of time and then bring them back?

3           THE COURT:  Well, yes, because they have to decide the

4    verdict on the -- so here's the way it works:  I give the jury

5    my instructions of law.  And I say to them, on punitive

6    damages, here's the standard for punitive damages, to determine

7    whether or not you want to award punitive damages, not how

8    much, but which doesn't, for example, refer to the financial

9    situation of any given party, and if you find liability on any

10   claim, check the box that says on this claim we want to award

11   punitive damages we do not want to award punitive damages.

12          So they're then out for two hours or 20 hours or two

13   weeks, deciding the basic issues in the case.

14          MR. BURSOR:  Right.

15          THE COURT:  That gives us lots of time to prepare for

16   any punitive damages.

17          If they say, yes, we want punitive damages, then we

18   call them back.  Usually it can be done within a half day of

19   evidence, but every case is different.  We give them whatever

20   evidence is relevant to the amount of punitive damages, you

21   know, some of that evidence they've already heard but some of

22   it, like on financial stuff they haven't heard, and then they

23   go back out and decide that last question.

24          So we don't know how long they will be out.  It can be

25   a little or lot in a case like this.  I think it seems

E9BKEBIM

```
 1    self-evident that they would be out at least a half day, maybe
 2    two days.
 3              MR. BURSOR:  So if the box is checked, yes, we want to
 4    do punitive damages, we then immediately go back into court and
 5    begin the punitive damages phase of the trial?
 6              THE COURT:  Once they come back with their verdict,
 7    yes.
 8              MR. BURSOR:  OK.  So that was my concern --
 9              THE COURT:  There's no further delay, but that's why
10    you have to get the stuff before then, but I don't think you
11    have to get it now.  OK?
12              MR. JURELLER:  Just two brief points.  You had asked
13    if there was anything further.
14              One thing I didn't want to gloss over:  You had asked
15    about the three best cases that plaintiff had.  We actually
16    addressed each of those on pages 7 and 8 of our reply brief.  I
17    wanted to point that out because I think all of them are not on
18    point or different in some way.
19              I also wanted to similarly address a recent decision
20    on the class certification.  We had put it into our reply brief
21    because the class cert was brought up in the opposition, but it
22    wasn't in the certification briefing because it came after the
23    fact, and that's the EQT Production versus Adair case in the
24    Fourth Circuit, the Westlaw is 214 WL 4070457.  So just for
25    completeness, I just want to bring that to the Court's
```

E9BKEBIM

 1  attention as well.

 2              THE COURT:  Yes.  I'll ask you the same question,

 3  though all judges are equal:  Who wrote that opinion?

 4              MR. JURELLER:  It looks like Diaz.  Diaz; is that

 5  right?  Court of Appeals, Diaz, Second Circuit judge held --

 6              THE COURT:  And the panel was?

 7              MR. JURELLER:  Let me see here.  I'm sorry.

 8              THE COURT:  Well --

 9              MR. JURELLER:  It's Wilkinson, Keenan and Diaz.

10              THE COURT:  I'm sorry?

11              MR. JURELLER:  It's Wilkinson, Keenan and Diaz that

12  appeared on that.

13              THE COURT:  Judge Wilkinson?  They're all great

14  judges.  All judges are great.

15              MR. JURELLER:  Good to hear.

16              THE COURT:  But Judge Wilkinson is again a very good

17  judge.

18              Very good.  Thank you.

19              MR. JURELLER:  Thank you, your Honor.

20                               * * *

21

22

23

24

25